# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

CRAIG E. ELLINGSON and SHERRY       )
ELLINGSON, individually and as Co-    )
Administrators for the ESTATE OF      )
BRANDON ELLINGSON, deceased, and      )
JENNIFER ELLINGSON,                   )       No. 2:14-CV-04316-NKL
                                      )
        Plaintiffs,                )
                                      )
v.                                    )
                                      )
ANTHONY PIERCY, et al.,               )
                                      )
        Defendants.                )

## ORDER

This case arises out of the drowning death of Brandon Ellingson, which happened while he was in the custody of Defendant Anthony Piercy, a Missouri State Trooper, serving in the Water Patrol Division, Troop F, of the Missouri State Highway Patrol (MSHP). The Plaintiffs are Brandon's mother, father, and sister. They are suing Piercy and 15 additional state or county employees, alleging the Defendants violated both federal and state law while Brandon was in custody and during the subsequent investigation of his death.

Defendant M.B. Jones, Coroner of Morgan County, Missouri, moves to dismiss all claims against him. [Doc. 60.] Fourteen other Defendants move to dismiss in part: Colonel Ronald Replogle; Major J. Bret Johnson; Captain Gregory Kindle; Lieutenant Darewin Clardy; Lieutenant Justin McCullough; Corporal David Echternacht; Corporal Eric Stacks; Sergeant Donald Barbour; Sergeant Chris Harris; Trooper Timothy Fick; Captain Sarah L. Eberhard; Lieutenant Rick Herndon; the MSHP; and the State of Missouri. [Doc. 58.]

For the reasons discussed below, Jones' motion to dismiss is granted, and motion of the 14 other Defendants is granted in part and denied in part.

## I.    Background[1]

On May 31, 2014, twenty-year old Brandon Ellingson was operating a private boat with some friends on the Lake of the Ozarks.  Trooper Piercy stopped Brandon's boat for possible vehicle registration and littering violations.  Piercy had Brandon come aboard the patrol boat to determine whether Brandon was intoxicated.  After performing a field sobriety test, Piercy determined Brandon was intoxicated and handcuffed Brandon at the wrists, with Brandon's arms behind his back.  Leaving Brandon handcuffed, Piercy pulled a Type III life vest—with the buckles already fastened—over Brandon's head, and did not fasten the life vest's crotch strap.  Piercy did not know a Type III life vest had a crotch strap.  MSHP policy required a Type I or Type II personal flotation device to be used on a handcuffed person.  A Type I device was available on Piercy's patrol boat.

Piercy had attended the MSHP's water school in 2013 in order to serve part-time with the Water Patrol.  But as of May 31, 2014, "Piercy had received insufficient training, both in the classroom and on the water, including the training needed to be qualified in swimming, boat operation, equipment usage and operation, water rescue, and procedures to allow him to serve without supervision on the water."  [Doc. 45, p. 6, ¶ 29.]  The Plaintiffs allege on information and belief that Colonel Replogle and Major Johnson approved a marine training program lacking sufficient benchmarks to ensure officers were prepared to safely perform arrests and transportation on the water, before being permitted and scheduled to do so without supervision,

---

[1]    These facts are taken from the Second Amended Complaint.  [Doc. 45.]  For purposes of deciding the motions to dismiss, the Court accepts the Plaintiffs' factual allegations as true and construes them in the light most favorable to the Plaintiffs.  *See Stodghill v. Wellston Sch. Dist.,* 512F.3d 472, 476 (8th Cir. 2008).

Case 2:14-cv-04316-NKL   Document 95   Filed 06/15/15   Page 2 of 28

and knowingly rushed insufficiently trained officers such as Piercy onto the water in order to log more arrests and citations on the Lake. [*Id.*, p. 15, ¶ 85.] The Plaintiffs also allege on information and belief that Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, and Corporal Echternacht knew Piercy could only swim at low proficiency, did not know how to properly operate his patrol boat, and that because of his inability and training he posed a risk to individuals whom he would be arresting and transporting on the water, but Kindle, Clardy, McCullough, and Echternacht knowingly permitted Piercy to patrol on the water without supervision, for the purpose of logging more arrests and citations on the Lake. [*Id.*, p. 15, ¶ 86.]

When Piercy started to take Brandon away in the patrol boat, Brandon was not buckled into a seat but leaning against a seat to Piercy's right. Piercy operated the patrol boat at speeds up to 46 miles per hour, notwithstanding that the water on the lake was rough. Piercy hit a wave, causing Brandon to be involuntarily ejected from the boat into the water. Brandon's life vest came off within moments. Piercy eventually put a Type V personal flotation device on himself and got in the water to attempt a rescue. Piercy, who mistakenly thought the Type V device would auto-inflate, could not bring up Brandon, and Brandon drowned.

Three hours after Brandon drowned, Trooper Fick told Brandon's friends, who were trying to find Brandon, that Brandon was still in custody because he had been confrontational and aggressive with the arresting officer. Fick knew what he said was false.

The Plaintiffs allege on information and belief that Sergeant Barbour, Piercy's direct supervisor, spoke with Piercy by phone shortly after the drowning, about Brandon's arrest and transportation, but that Barbour did not prepare an official report about the conversation, in violation of MSHP policy. [*Id.*, p. 12, ¶ 73.] The Plaintiffs further allege on information and belief that Corporal Echternacht knew Barbour had spoken with Piercy and failed to prepare an

3

official report about the conversation, and knowingly consented to Barbour's violation of policy. [*Id.*, p. 12, ¶ 74.]

The Plaintiffs allege on information and belief that Colonel Replogle and Captain Eberhard appointed Corporal Stacks as lead marine investigator of the drowning incident, knowing Stacks had neither training in investigations of marine incidents or marine deaths, nor experience performing such investigations. [*Id.*, pp. 12-13, ¶¶ 75 and 77.] Sergeant Harris, who was also investigating the incident, similarly lacked training and experience. Captain Eberhard and Lieutenant Herndon were responsible for ensuring officers charged with investigations into incidents such as Brandon's drowning had proper training and experience. The Plaintiffs allege on information and belief that Captain Eberhard and Lieutenant Herndon were also responsible for supervising the investigation; permitted it to be improperly steered to absolve Piercy and the MSHP; and failed to ensure the reports were being properly reviewed and documented pursuant to MSHP policy. [*Id.*, p. 14, ¶ 83.]

During the investigation, Corporal Stacks, Sergeant Harris, and Captain Eberhard intentionally attempted to steer witnesses to make statements favorable to Piercy's actions, and contradict admissions made by Piercy and known to Stacks, Harris, and Eberhard, including Piercy's admission that the Type III life vest was improperly secured. Further, in the course of investigating Brandon's death, Sergeant Harris and Corporal Stacks interviewed Sergeant Randy Henry[2] regarding information Henry had gathered from conversations with Piercy the night of Brandon's death. Harris and Stacks refused to collect relevant information Henry provided. They turned off the audio recording of Henry's interview. They also intentionally excluded from their report, relevant information provided by Henry.

---

[2] Sergeant Henry is not a defendant.

4

One month after the drowning, Corporal Echternacht submitted a Marine Accident Investigation Report, stating Brandon voluntarily left Piercy's patrol boat, a statement Echternacht knew to be false. The Plaintiffs allege on information and belief that an earlier version of Echternacht's report indicated Brandon had been involuntarily ejected from the boat, but that Lieutenant McCullough instructed Echternacht to change the report to say Brandon voluntarily left the boat, for the purpose of absolving Piercy and the MSHP of responsibility for Brandon's death. [Doc. 45, p. 11, ¶ 67.]

The Plaintiffs allege on information and belief that Colonel Replogle reviewed the "325" reports prepared and issued in the investigation of Brandon's death, knowing that a mandatory procedural requirement had not been carried out, specifically, that Corporal Echternacht's report had not been reviewed by a supervisor. [*Id.*, p. 14, ¶ 81.] But Replogle intentionally allowed the requirement to go unfulfilled. Further, in violation of MSHP policy and procedure, no one ultimately signed the MSHP's investigative report, nor signed off as having reviewed it.

Captain Kindle, Lieutenant Clardy, and Sergeant Barbour "attended Troop F Sergeants meetings, at which they stated having the investigation 'handled', indicating a specific intent for the investigation to protect Piercy from legal action for Brandon's death while in custody." [*Id.*, p. 15, ¶ 87.][3] "As ranking and supervising officers within the [MSHP], generally, and Troop F, specifically, [Captain Kindle and Lieutenant Clardy] are responsible for ensuring officers subject to their supervision and command are properly and fully trained[.]" [*Id.*, p. 15, ¶ 88.]

Coroner Jones obtained a blood sample from Brandon's body the day after the drowning, which showed a blood alcohol content of .243, but did not show the presence of cocaine. A second toxicology report reflected a BAC of .268, as well as cocaine metabolites. At the

---

[3] Although the statement is unartfully stated, the Court assumes the Plaintiffs are alleging these Defendants said that they were having the investigation handled.

5

Coroner's Inquest, Jones presented only the second toxicology report and did not disclose the results of the first one. The Plaintiffs allege on information and belief that Jones, in derogation of his duties under Mo. Rev. Stat. §§ 58.451.1(5) and 58.330, permitted Lieutenant Clardy to decide that Sergeant Henry, who was Piercy's immediate supervisor and who spoke with Piercy immediately after Brandon's death, would not testify at the inquest. [*Id.*, p. 16, ¶ 91.] Accordingly, Plaintiffs allege on information and belief, Jones did not call Henry to testify, despite Jones' knowledge of Henry's information. [*Id.*, p. 17, ¶ 92.] For the purpose of hiding the truth and absolving Piercy and the MSHP of responsibility for Brandon's death, Jones also failed to present relevant testimony of Brandon's friends about Piercy's conduct.

Corporal Stacks intentionally withheld relevant evidence during the Coroner's Inquest. He did not disclose that he had participated in a video-recorded recreation of the incident, which showed the patrol boat being operated at 46 miles per hour and Stacks' difficulty remaining in the boat despite having use of both hands. Coroner Jones knew about the recreation of the incident and the video, and intentionally withheld the information at the inquest.

The Plaintiffs plead nine causes of action:

| Count I | Civil Rights Violation under 42 U.S.C. § 1983, against Trooper Piercy (individually) |
|---|---|
| Count II | Civil Rights Violation under 42 U.S.C. § 1983, against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually) |
| Count III | Civil Conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986, against Trooper Piercy, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Corporal Stacks, Trooper Fick, Captain Eberhard, Lieutenant Herndon, and Coroner Jones (individually) |
| Count IV | Negligence, against Trooper Piercy (individually and in his official capacity) |

| Count V | Negligence Per Se, against Trooper Piercy (individually and in his official capacity) |
|---|---|
| Count VI | Negligent Hiring, Training, and Supervision (of Trooper Piercy) under Mo. Rev. Stat. § 537.080, against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually and in their official capacities), and against the State of Missouri and the MSHP |
| Count VII | Negligent Hiring, Training, and Supervision (of Corporal Stacks and Sergeant Harris) under Mo. Rev. Stat. § 537.080, against Colonel Replogle, Captain Eberhard, and Lieutenant Herndon (individually and in their official capacities) |
| Count VIII | Respondeat Superior under Mo. Rev. Stat. § 537.080, against the State of Missouri and the MSHP |
| Count IX | Conspiracy to Commit Abuse of Process, under state law, against Trooper Piercy, Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Corporal Stacks, Trooper Fick, Captain Eberhard, Lieutenant Herndon, and Coroner Jones (individually and in their official capacities) |

[Doc. 45.]

## II.    Discussion

The Defendants move to dismiss Counts II, III, VI, VII, and IX under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

To avoid dismissal under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. This standard requires more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id*.

7

Furthermore, where the allegations show on the face of the complaint there is some insurmountable bar to relief, dismissal under Rule 12(b)(6) is appropriate. *Parnes v. Gateway 2000, Inc*., 122 F.3d 539, 546 (8th Cir. 1997).

### A. Count III—Civil conspiracy under §§ 1983, 1985, and 1986, against Coroner Jones in his individual capacity

Coroner Jones argues he is entitled to absolute immunity for his alleged acts and omissions in conducting the coroner's inquest, because it was a quasi-judicial proceeding, and because he functioned in a capacity equivalent to that of a prosecutor in a grand jury proceeding.

A functional approach has been adopted by the United States Supreme Court to determine when a public official is performing a quasi-judicial or quasi-prosecutorial function that entitles the official to the same absolute immunity afforded judges and prosecutors. *Redwood Vill. P'ship v. Graham*, 26 F.3d 839, 840 (8th Cir. 1994) (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982)). "The critical inquiry is the nature of the official's function in a particular proceeding, not the identity of the actor who performed the function." *Redwood Vill. P'ship*, 26 F.3d at 841 (*citing Forrester v. White,* 484 U.S. 219, 229 (1988); *Brown v. Griesenauer,* 970 F.2d 431, 436 (8th Cir.1992)). In addition to analyzing the nature of the function being performed by the official, and not merely the official's title, the nature of the proceeding is analyzed in terms of the overall character of the proceedings, and not merely the title or forum of the proceeding. *Redwood Vill. P'ship*, 26 F.3d at 841 (*citing Brown,* 970 F.2d at 436; *Dist. of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 477 (1983)).

In *Williams v. Hartje*, 827 F.2d 1203 (8th Cir. 1987), the Eighth Circuit performed such an analysis of a coroner's inquest under Arkansas law. There, the surviving relatives of the decedent alleged that the county sheriff, the county prosecutor, the county coroner, and various

8

other law enforcement officers concealed an autopsy report to cover up that the decedent died as a result of being beaten by the sheriff and a jailer at the county jail in 1960. *Id.* at 1204-07. The deputies who arrested the decedent said he fell and struck his forehead on the steps of the jail because he was intoxicated. *Id*. at 1205. But the autopsy report indicated the decedent died as a result of a fractured skull behind his left ear and there was no alcohol in his blood. *Id.* at 1206. The autopsy report was never presented to the jury during the coroner's inquest, and the jury found the death was not caused by a criminal act. *Id.* at 1205.

Then in 1984, a person who was an inmate at the county jail when the decedent died came forward, stating he witnessed the sheriff and a jailer beat the decedent. *Id.* Although the person previously testified during the coroner's inquest that he had not seen or heard anything, he recanted and stated that the prosecuting attorney, who assisted the corner during the coroner's inquest, threatened him. *Id.* Based upon the new testimony, the plaintiffs obtained a copy of the autopsy report and filed a civil rights lawsuit. *Id.* The plaintiffs alleged the county prosecutor violated their constitutional rights by concealing the autopsy report during the coroner's inquest and threatening a witness. *Id.*

The prosecutor claimed he was entitled to absolute immunity regarding the plaintiffs' allegation that he did not present the autopsy report to the jury during the coroner's inquest. *Id.* The Eighth Circuit analyzed the character of the coroner's inquest proceeding and the prosecutor's function during the proceeding:

> The coroner's role in the criminal process is to call a jury for the purpose of inquiring into the cause, circumstances, and manner of death when a body has been found and there are circumstances which cause suspicion of foul play. The coroner has the power to summon and examine under oath suspects and other witnesses, have a transcript prepared, and submit the evidence to the jury for their decision.

*Id.* at 1209. Based upon the procedures of the coroner's inquest and the function of the coroner, the Eighth Circuit concluded that the "coroner's inquest… was a quasi-judicial proceeding analogous to a grand-jury inquisition[.]" *Id.* The Eighth Circuit then analyzed the prosecutor's function during the coroner's inquest and found that his function was to assist the coroner. *Id.* at 1209. The court first concluded:

> If the coroner were the defendant in this case, it would seem clear that his actions would be immune from suit for damages; he would have the benefit of the same immunity which a prosecutor enjoys in the grand-jury setting, because the coroner's inquest is a quasi-judicial proceeding for the purpose of inquiring into the circumstances of a suspicious death and, if appropriate, laying criminal charges.

*Id.* The court further concluded that the prosecutor's function in assisting the coroner was to act as an advocate for the state during the coroner's inquest in order to determine if any criminal conduct caused the death. *Id.* Accordingly, the prosecutor was entitled to absolute immunity for his function in assisting the coroner during the coroner's inquest. *Id.*

Furthermore, "allegations that a prosecutor knowingly offered, used or presented false, misleading or perjured testimony at trial or before a grand jury do not defeat absolute prosecutorial immunity, regardless of how reprehensible such conduct would be if it occurred." *Myers v. Morris,* 810 F.2d 1437, 1446 (8th Cir.1987) (*abrogated on other grounds by Burns v. Reed,* 500 U.S. 111 (1991) (citations omitted)). "The same is true for allegations of withholding or suppressing exculpatory evidence." *Myers,* 810 F.2d at 1446-49. A prosecutor's absolute immunity "is not defeated by allegations of malice, vindictiveness, or self-interest." *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 580 (8th Cir. 2006) (*citing Myers,* 810 F.2d at 1446).

In addition, an official is also absolutely immune from a claim of civil conspiracy when the official's alleged participation in the conspiracy consists of otherwise immune acts.

*Reasonover*, 447 F.3d at 580 (*citing Rowe v. City of Fort Lauderdale,* 279 F.3d 1271, 1282 (11th Cir. 2002), and *Myers,* 810 F.2d at 1446).

The procedures for conducting a coroner's inquest and the functions of the coroner during a coroner's inquest under Missouri law are similar to the Arkansas procedures and functions analyzed by the Eighth Circuit in *Williams*. In Missouri, a coroner has discretionary authority to issue a coroner's warrant to summon a jury to appear at a coroner's inquest in order for the jury to determine the cause and manner of a person's death, when the coroner believes the cause and manner of death are uncertain and in need of further inquiry or examination. Mo. Rev. Stat. §58.260; §58.451.8. The coroner specifically instructs the jury that it is to determine if the death in question was caused by a felony or an accident and, if by felony, to determine who participated in the felony. Mo. Rev. Stat. §58.310; §58.360. If the jury determines the death occurred as a result of a felony, the coroner must present the verdict to an associate circuit judge or other county judge for the judge to issue an arrest warrant. Mo. Rev. Stat. §58.370. The coroner also has the power to subpoena and examine witnesses under oath at the coroner's inquest to determine their knowledge concerning a death. Mo. Rev. Stat. §58.330; §58.340. Similarly, the corner has the power to subpoena documents, materials, and other evidence to present to the jury during the coroner's inquest. §58.330. If a witness fails to appear pursuant to the coroner's subpoena, the coroner can issue a writ of attachment to compel the witness's attendance at the coroner's inquest. §58.380. A transcript of the coroner's inquest is prepared at the request of the coroner. Mo. Rev. Stat. §58.350.

Like the Arkansas coroner's inquest analyzed in *Williams*, the purpose of a coroner's inquest in Missouri and the function of the coroner during the proceedings are to determine whether a person's death was the result of a criminal act and, if so, to seek criminal charges

against the individuals who participated in the criminal act.  Also like the coroner in *Williams*, the coroner under Missouri law has the power to subpoena and examine witnesses under oath and subpoena other evidence to present to the jury during the coroner's inquest.  The Court concludes the coroner's inquest conducted by Coroner Jones was a quasi-judicial proceeding, as a matter of law.  Furthermore, Coroner Jones' function during the coroner's inquest was equivalent to a prosecutor's function during a grand jury proceeding.  Therefore, Coroner Jones is entitled to absolute immunity for his actions in presenting, or not presenting, testimony or other materials during the coroner's inquest he conducted.  Coroner Jones is entitled to absolute immunity even if he acted with malice, intentionally failed to present evidence, or presented false or misleading evidence.   The Plaintiffs' conspiracy claims are also barred by absolute immunity because Coroner Jones' alleged participation in the conspiracy consisted of otherwise immune acts, that is, his decision not to present certain testimony and other materials at the coroner's inquest.

The Plaintiffs' arguments are unavailing.  They rely on case law in which absolute immunity has been held not to apply to a prosecutor:  *McGhee v. Pottawattamie County,* 547 F.3d 922 (8th Cir. 2008), and *Whitlock v. Brueggemann,* 682 F.2d 567 (7th Cir. 2012).  [Doc. 65, p. 8.]  But the Plaintiffs do not allege Coroner Jones, like the prosecutor in *McGhee*, "obtain[ed], manufactur[ed], coerc[ed] and fabricat[ed] evidence."  547 F.3d at 933.   The Plaintiffs also cite *Whitlock,* to argue that a prosecutor is not entitled to absolute immunity when he acts acted outside the scope of his quasi-prosecutorial function by performing an investigatory function.  Plaintiffs do not allege Coroner Jones himself performed any investigatory function.   The Plaintiffs also alleged others performed the blood tests, not Coroner Jones.

Finally, the Plaintiffs argue Coroner Jones somehow loses absolute immunity because he

yielded his statutory authority to Lieutenant Clardy, permitting Clardy to decide Sergeant Henry would not testify at the inquest. But Missouri law gives a coroner absolute discretion in determining who will testify and what evidence will be presented at an inquest. §§ 58.260, .330, and .451.8. Absolute discretion necessarily encompasses authority to obtain input from others regarding whom to call to testify, and to even defer to someone's opinion about who should be called as a witness.

Count III against Coroner Jones is dismissed with prejudice.

**B. Count IX—Conspiracy to commit abuse of process, under state law, against Coroner Jones in his individual and official capacities**

**1. Individual capacity claim**

Coroner Jones argues he is entitled to absolute immunity with respect to the state law tort claim brought against him in his individual capacity.

As discussed in connection with the Count III civil conspiracy claim under federal law, Coroner Jones's function during the coroner's inquest was equivalent to the function of a prosecutor during a grand jury proceeding. He is therefore entitled to absolute immunity on the Plaintiffs' state law civil conspiracy claim to commit abuse of process. In *State ex rel. Bird v. Weinstock*, 864 S.W.2d 376 (Mo. Ct. App. 1993), the Missouri Court of Appeals applied the functional approach to determine whether a guardian *ad litem* was entitled to absolute immunity on the plaintiff's state law tort claim of legal malpractice. *Id.* at 381-82. A guardian *ad litem* participates in the adjudicatory process by exercising the statutory power to investigate; to examine, cross-examine, and subpoena witnesses; and to offer testimony and other evidence, in order for a court to render a decision. *Id.* at 384. Therefore, a guardian *ad litem* is entitled to absolute immunity on a state law tort claim. *Id.* at 385-86. *See also Carden v. George*, 291 S.W.3d 852, 854 (Mo. Ct. App. 2009) (a prosecutor has absolute immunity from civil liability

for initiating and pursuing a criminal case under Missouri common law). Absolute immunity likewise applies to Coroner Jones.

Count IX against Coroner Jones in his individual capacity is dismissed with prejudice.

### 2. Official capacity claim

Jones is entitled to sovereign immunity with respect to the state-law tort claim brought against him in his official capacity.

A claim under Missouri state law asserted against a government official in his official capacity is deemed a claim against the government entity the official is serving, and is barred by sovereign immunity because it is essentially a direct claim against the state. *Betts–Lucas v. Hartmann,* 87 S.W.3d 310, 327 (Mo. Ct. App. 2002), and *Edwards v. McNeill,* 894 S.W.2d 678, 682 (Mo. Ct. App. 1995). Under Mo. Rev. Stat. §537.600, a Missouri county is entitled to sovereign immunity from tort actions. *Moses v. County of Jefferson*, 910 S.W.2d 735, 736 (Mo. Ct. App. 1995) (*citing Wood v. County of Jackson,* 463 S.W.2d 834 (Mo. 1971), and §537.600).

Any alleged waiver of sovereign immunity must be strictly construed. *Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 2015 WL 778079, at *4 (Mo. Ct. App. Feb. 24, 2015). Thus, "finding a municipality liable for torts is the exception to the general rule of sovereign immunity, and a plaintiff must plead with specificity facts demonstrating his claim falls within an exception to sovereign immunity." *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 241-42 (Mo. Ct. App. 2007).

Missouri has statutorily waived its sovereign immunity in two limited instances—negligent operation of a motor vehicle by a public employee, and dangerous conditions of state property. Mo. Rev. Stat. § 537.600. Section 537.600.1, the waiver to which the Plaintiffs point, provides:

> [T]he immunity of the public entity from liability and suit for
> compensatory damages for negligent acts or omissions is hereby
> expressly waived in the following instances:
>
> (1) Injuries *directly* resulting from the negligent acts or omissions
> by public employees arising out of the *operation* of motor vehicles
> or motorized vehicles within the course of their employment….

[Emphasis added.] This waiver is narrow, in that it explicitly requires the alleged injury to have

*directly* resulted from the *operation* of a motor vehicle. *Sanders*, 807 S.W.2d at 89. The

operation of a motor vehicle encompasses "'all acts necessary to be performed in the movement

of a motor vehicle from one place to another.'" *Johnson v. Carthell*, 631 S.W.2d 923, 926-27

(Mo. Ct. App. 1982). In *Johnson*, a school bus driver restrained a student so that another person

could hit him. *Id.* The court held the school district was entitled to sovereign immunity with

respect to the student's claim of assault. *Id.* The motor vehicle waiver of sovereign immunity

did not apply, because the assault did not directly result from the operation of a motor vehicle.

*Id.* (citing *Hay v. Ham*, 364 S.W.2d 118, 122 (Mo. Ct. App. 1962)).

The Plaintiffs do not allege Coroner Jones directly participated in a tort involving

negligent operation of a motor vehicle. Accordingly, the motor vehicle waiver does not apply

and Jones is entitled to sovereign immunity with respect to the Count IX claim against him in his

official capacity.

The Plaintiffs argue the propriety function exception to sovereign immunity precludes

dismissal of the official capacity claim against Coroner Jones. But Jones was serving Morgan

County at the time of the inquest. The propriety function exception does not apply to Missouri

*counties*; a county is protected from claims based on governmental as well as proprietary

functions. *Helamicek Bros., Inc. v. St. Louis County*, 883 S.W.2d 108, 109 (Mo. Ct. App. 1994)

("'Though the doctrine of sovereign immunity protects a municipality only against claims which

arise from exercise of its governmental function, a county is protected against all claims.'") (*quoting Coleman v. McNary*, 549 S.W.2d 568, 569 (Mo. Ct. App. 1977)).

The Plaintiffs' cited authorities, *Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. 2008), and *Conway v. St. Louis County*, 254 S.W.3d 159 (Mo. Ct. App. 2008), do not change the analysis. *Southers* did not involve any claims against a Missouri county or its officials, and the court never discussed whether the governmental-proprietary distinction applied to Missouri counties. Likewise, the court in *Conway* never analyzed any claims against a Missouri county or its officials because the plaintiffs specifically stated on appeal that they had affirmatively abandoned appeal of the summary judgment to the defendant county. 254 S.W.3d at 161, n.2. The sovereign immunity analysis in *Conway* was limited to the plaintiffs' state law claims asserted against a defendant city. *Id.* at 167.

The Count IX, official capacity claim against Coroner Jones is dismissed with prejudice.

### C. Count II—Civil Rights Violation under 42 U.S.C. § 1983, against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually)

Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour argue that the Plaintiffs have failed to state a claim under Count II because the Plaintiffs merely allege these Defendants "are liable for failing to establish appropriate 'policies, procedures, patterns, practices, and/or customs[,]'" and because they "appear to [have been] sued merely because of their supervisory positions within the [MSHP]." [Doc. 59, pp. 5-6.]

A claim under Section 1983 requires a plaintiff to plead and prove that each defendant was personally involved in the alleged deprivation of a constitutional right. *Beck v. LaFleur,* 257 F.3d 764, 765 (8th Cir. 2001); *Martin v. Sergent,* 780 F.2d 1334, 1337 (8th Cir. 1985). The

16

plaintiff "must allege facts supporting any individual defendant's personal involvement in or responsibility for the violations." *Ellis v. Norris,* 179 F.3d 1078, 1078 (8th Cir. 1999). The requisite personal involvement cannot be based upon *respondeat superior* or vicarious liability. *Iqbal,* 556 U.S. at 670; *Canton v. Harris,* 489 U.S. 378, 385 (1989). Allegations that the supervisor "knew of, condoned, and willfully and maliciously agreed to subject" to, was the "principal architect" of the unconstitutional policy, etc. alone are not sufficient to establish supervisory liability unless they are affirmatively supported in the plaintiff's complaint. *Iqbal,* 556 U.S. at 680–681.

Thus, "a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation[.]" *Parrish v. Ball,* 594 F.3d 993, 1001 & n.1, 1002 (8th Cir. 2010) (internal quotations and citation omitted). For example, in *Morales v. Chadbourne,* 2014 WL 554478, at *6-8 (D.R.I. Feb. 12, 2014), the district court denied dismissal of claims against supervisors who allegedly supervised and trained subordinates with deliberate indifference to constitutional rights of citizens such as the plaintiff in the issuance of immigrant detainers. The plaintiff alleged that the supervisory defendants were specifically responsible for the rules and regulations at issue in the case; that the defendants "put in place the specific policies and practices that caused" the plaintiff's rights to be violated; that they knew their subordinates regularly issued immigrant detainers without sufficient investigation and without probable cause; and that they "formulated, implemented, encouraged, or willfully ignored these policies and customs with deliberate indifference to the high risk of violating the plaintiff's rights under the Fourth Amendment." 2014 WL 554478, at *8. The district court concluded the allegations provided enough detail, consistent with *Iqbal,* to provide the defendants with fair

notice of what the claim was and the grounds upon which it rested. *Id.*

Similar to the allegations against the supervisors in *Morales,* here the Plaintiffs allege Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour are responsible for establishing, maintaining, enforcing, and training regarding MSHP's official policies, procedures, patterns, practices and customs for effectuating the arrest of individuals who operate a boat while intoxicated. But, the Plaintiffs allege, these "Defendants, deliberately and with reckless disregard for the constitutional rights of the people or persons within the custody of the [MSHP], failed to establish adequate and sufficient policies and procedures for training supervisors and officers…to safely" do so. [*Id.*, p. 20, ¶ 103.]

The Plaintiffs additionally allege that as of May 31, 2014, Trooper Piercy had not received sufficient training in the classroom and on the water—in swimming, boat operation, equipment usage and operation, water rescue, and other procedures—to allow him to serve alone on the water. The Plaintiffs allege on information and belief that Colonel Replogle and Major Johnson approved a marine training program lacking sufficient benchmarks to ensure officers were prepared to safely perform arrests and transportation on the water, before being permitted and scheduled to do so without supervision, and knowingly rushed insufficiently trained officers such as Piercy onto the water in order to log more arrests and citations on the Lake. The Plaintiffs also allege on information and belief that Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, and Corporal Echternacht knew Piercy could only swim at low proficiency, that he did not know how to properly operate his patrol boat, and that because of his inability and training he posed a risk to individuals whom he would be arresting and transporting on the water, but Kindle, Clardy, McCullough, and Echternacht knowingly permitted him to

18

patrol on the water without supervision, for the purpose of logging more arrests and citations on the Lake. The Plaintiffs allege MSHP policy required a Type I or Type II personal flotation device to be used on a handcuffed person. A Type I device was available on Piercy's patrol boat, but Piercy did not know it was there, and did not know to use it.

The Plaintiffs allege on information and belief that Sergeant Barbour, Piercy's direct supervisor, spoke with Piercy by phone shortly after the drowning, about Brandon's arrest and transportation, but that Barbour did not prepare an official report about the conversation, in violation of MSHP policy. The Plaintiffs further allege on information and belief that Corporal Echternacht knew Barbour had spoken with Piercy and failed to prepare an official report about the conversation, and knowingly consented to Barbour's violation of policy.

The Plaintiffs allege on information and belief that Colonel Replogle and Captain Eberhard appointed Corporal Stacks as lead marine investigator of the drowning incident, knowing Stacks had neither training in investigations of marine incidents or marine deaths, nor experience performing such investigations. Sergeant Harris, who was also investigating the incident, similarly lacked training and experience.

One month after the drowning, Corporal Echternacht submitted a Marine Accident Investigation Report, stating Brandon voluntarily left Piercy's patrol boat, a statement Echternacht knew to be false. The Plaintiffs allege on information and belief that an earlier version of Echternacht's report indicated Brandon had been involuntarily ejected from the boat, but that Lieutenant McCullough instructed Echternacht to change the report to say Brandon voluntarily left the boat, for the purpose of absolving Piercy and the MSHP of responsibility for Brandon's death.

The Plaintiffs allege on information and belief that Colonel Replogle reviewed the "325"

reports prepared and issued in the investigation of Brandon's death, knowing that a mandatory procedural requirement had not been carried out, specifically, that Corporal Echternacht's report had not been reviewed by a supervisor. But Replogle intentionally allowed the requirement to go unfulfilled. Further, in violation of MSHP policy and procedure, no one ultimately signed the MSHP's investigative report, nor signed off as having reviewed it.

Captain Kindle, Lieutenant Clardy, and Sergeant Barbour attended Troop F Sergeants meetings, where they stated they were having the investigation handled, indicating a specific intent for the investigation to protect Piercy from legal action for Brandon's death while in custody. Kindle and Clardy were ranking and supervising officers of the MSHP, generally, and Troop F, specifically, and are responsible for ensuring officers subject to their supervision and command are properly and fully trained.

Whether the Plaintiffs can ultimately succeed on their Count II claim against these Defendants, the foregoing allegations are based on more than vicarious liability of supervising officials. They provide enough detail, consistent with *Iqbal*, to give the defendants fair notice of what the claim is and the grounds upon which it rests.

Accordingly, Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour's motion to dismiss Count II against them is denied without prejudice.

### D. Count III—Civil Conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986, against Captain Kindle, Lieutenant Clardy, and Sergeant Barbour Sergeant (individually)

Captain Kindle, Lieutenant Clardy, and Sergeant Barbour argue the Plaintiffs failed to sufficiently allege a meeting of the minds to deprive the Plaintiffs of their constitutional rights by covering up the cause of Brandon's death while in custody.

A claim of conspiracy to deprive a person of his civil rights requires, among other things,

allegations of specific facts showing a "meeting of the minds" or understanding among the conspirators to achieve the conspiracy's aims. *Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988); *Putman v. Gerloff*, 701 F.2d 63, 65 (8th Cir. 1983). "A commonly held belief…is not a conspiracy." *Meyers v. Morris*, 810 F.2d 1437, 1454 (8th Cir. 1987), (*abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991)). "Various people engaged in investigating and reporting [particular] activity does not amount to conspiracy." *Id.* A court must "look for a genuine factual issue of concerted activity toward an unlawful objective." *Id.* (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) (to create a genuine issue of conspiracy, plaintiffs had to point to at least some facts which would suggest that the defendants "reached an understanding" to violate their rights), and *Deck v. Leftridge,* 771 F.2d 1168, 1170 (8th Cir.1985) ("allegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a 'meeting of the minds' [directed] 'toward an unconstitutional action[.]'")).

The Plaintiffs allege on information and belief that Captain Kindle and Lieutenant Clardy knew Piercy could only swim at low proficiency, that Piercy did not know how to properly operate his patrol boat, and that because of Piercy's inability and training he posed a risk to individuals whom he would be arresting and transporting on the water, but Kindle and Clardy knowingly permitted Piercy to patrol on the water without supervision, for the purpose of logging more arrests and citations on the Lake. The Plaintiffs further allege on information and belief that Sergeant Barbour, Piercy's direct supervisor, spoke with Piercy by phone shortly after the drowning, about Brandon's arrest and transportation, but that Barbour did not prepare an official report about the conversation, in violation of MSHP policy. The Plaintiffs also allege Kindle, Clardy, and Barbour intended that the investigation protect Piercy from legal action relating to Brandon's death. Finally, the Plaintiffs allege on information and belief that

Lieutenant Clardy was the person who decided Sergeant Henry—who was Piercy's immediate supervisor and had spoken with Piercy immediately after Brandon's death—would not testify at the Coroner's inquest, even though Clardy had no lawful authority to make such a decision, and Henry had information demonstrating Piercy's responsibility for Brandon's death.

As noted above, to avoid dismissal under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Furthermore, "[w]hile plaintiffs may at times plead upon information and belief"—for instance, when facts are peculiarly within the opposing party's knowledge—the Eighth Circuit "emphasize[s] that information and belief does not mean pure speculation." *Pope v. Fed. Home Loan Mortg. Corp.*, 561 Fed. Appx. 569, 573 (8th Cir. 2014).

The Plaintiffs' allegations, construed in the light most favorable to them, are sufficiently specific and supported by fact to suggest a meeting of the minds directed toward an unconstitutional action. The Plaintiffs' allegations on information and belief are facts peculiarly within the knowledge of the opposing parties, and are not based on pure speculation. Whether the Plaintiffs can ultimately succeed on their Count III claim against these Defendants, the foregoing allegations are sufficient to withstand the motion to dismiss.

Accordingly, Captain Kindle, Lieutenant Clardy, and Sergeant Barbour's motion to dismiss Count III against them is denied, without prejudice.

**E. Count VI—Negligent Hiring, Training, and Supervision (of Trooper Piercy) under Mo. Rev. Stat. § 537.080, against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (in their individual and official capacities), and the State of Missouri and the MSHP**

**1. The State of Missouri and MSHP**

The State of Missouri and MSHP argue they are entitled to sovereign immunity with respect to the negligence count under state law.

Under Missouri law, the state and its agencies, including the MSHP, are entitled to sovereign immunity from all state law tort claims except for those expressly waived by statute. *Southers,* 263 S.W.3d at 609; *Conrod v. Mo. State Highway Patrol,* 810 S.W.2d 614, 617 (Mo. Ct. App. 1991). Causes of action for negligent hiring or supervision are torts. *Lonero v. Dillick,* 208 S.W.3d 323, 327-29 (Mo. Ct. App. 2006). Sovereign immunity is the rule, not the exception, and courts must strictly construe waivers of sovereign immunity. *Metro. St. Louis Sewer Dist.*, 2015 WL 778079, at *4. Missouri has statutorily waived its sovereign immunity in two limited instances—negligent operation of motor vehicles by a public employee, and dangerous conditions of state property. Mo. Rev. Stat. § 537.600.

In *Bowman v. State,* 763 S.W.2d 161, 163 (Mo. Ct. App. 1988), the appellate court noted that operating a motor vehicle, for purposes of § 537.600, encompasses "all acts necessary to be performed in the movement of a motor vehicle from one place to another or fairly incidental to the ordinary course of its operation[.]" The Plaintiffs point to no decision in which a Missouri state court has held that the tort of negligent hiring and supervision of an employee who was operating a vehicle is the same tort as negligent operation of a motor vehicle, and this Court is aware of none. Inasmuch as the motor vehicle waiver of sovereign immunity must be strictly construed, the Court holds the motor vehicle waiver does not apply to the Plaintiffs' claim of

23

negligent hiring and supervision.  Therefore, the State and the MSHP are entitled to sovereign immunity with respect to the negligence claim.

The Count VI claims against the State and the MSHP are dismissed with prejudice.

### 2.  Individual Defendants

Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour move for dismissal of the negligence claim relating to Trooper Piercy, brought under state law, on the basis of official immunity.  The Plaintiffs allege these Defendants negligently supervised and retained Trooper Piercy, because these "Defendants knew or should have known of Piercy's dangerous proclivities, and the threat of injury he posed in effectuating his duties on the water, due to his lack of training, subpar water skills, and inability to operate his vessel."  [Doc. 45, p. 28, ¶134.]

Official immunity insulates a state employee from suit in his individual capacity when liability arises from discretionary acts or omissions.  *Nguyen v. Grain Valley R-5 Sch. Dist.,* 353 S.W.3d 725, 733 (Mo. Ct. App. 2011); *Betts-Lucas*, 87 S.W.3d 310, 327 (Mo. Ct. App. 2002) (*citing Kanagawa v. State by and through Freeman,* 685 S.W.2d 831, 835 (Mo. 1985)).  When liability flows from a state employee's failure to perform a ministerial duty, official immunity will not bar suit against the employee.  *Id.* (*citing Kanagawa,* 685 S.W.2d at 835).  But sovereign immunity, if not waived, does bar suit against an employee sued in his official capacity, because such suits are essentially direct claims against the state.  *Id.* (citation omitted); *Edwards,* 894 S.W.2d at 682.

Discretionary acts require the "exercise of reason in the adoption of means to an end and discretion in determining how or whether an act should be done or pursued."  *Rustici v. Weidmeyer,* 673 S.W.2d 762, 769 (Mo. 1984). "A ministerial function, in contrast, is one of a

clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Southers v. City of Farmington,* 263 S.W.3d 603, 610 (Mo. 2008).

Here, the Plaintiffs point to Mo. Rev. Stat. § 43.060, which provides that no person shall be appointed as a member of the MSHP who is not able to pass the physical and mental examination that the superintendent prescribes. The Plaintiffs do not allege Trooper Piercy could not pass his hiring examinations. The Plaintiffs concede the establishment of policy for training and supervision of water patrol officers is a matter of discretion. [Doc. 66, p. 13.] Because all acts alleged involved discretion, these Defendants are entitled to official immunity with respect to the claims against them in their individual capacities.

The Count VI claims against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour in their individual capacities are dismissed with prejudice.

### F. Count VII—Negligent Hiring, Training, and Supervision (of Corporal Stacks and Sergeant Harris) under Mo. Rev. Stat. § 537.080, against Colonel Replogle, Captain Eberhard, and Lieutenant Herndon (individually and in their official capacities)

Colonel Replogle, Captain Eberhard, and Lieutenant Herndon move for dismissal of the negligence claim relating to Corporal Stacks and Sergeant Harris, brought under state law, on the basis of official immunity. Replogle, Eberhard, and Hendon are entitled to official immunity with respect to the claims brought against them in their individual capacities, for the same reasons the individuals sued under Count VI are entitled to it, as discussed above.

The Count VII claims against Colonel Replogle, Captain Eberhard, and Lieutenant Herndon are dismissed with prejudice.

### G. Count IX—Conspiracy to Commit Abuse of Process

Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Corporal Stacks, Trooper Fick, Captain Eberhard, and Lieutenant Herndon argue that because they issued no process, the Plaintiffs have failed to state a claim for conspiracy to commit abuse of process.

Missouri does not recognize a state law tort of civil conspiracy. *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 879 (Mo. Ct. App. 1985). Rather, allegations relating to civil conspiracy are a mechanism for establishing joint and several liability for an underlying tort. *Id.* An abuse of process claim requires a plaintiff to show: "(1) the…defendant made an improper, illegal, perverted use of process, which use was neither warranted nor authorized by the process; (2) the defendant had an illegal purpose in doing so; and (3) damage resulted." *Crow v. Crawford & Co.*, 259 S.W.3d 104, 116-17 (Mo. Ct. App. 2008) (citation omitted). The process must have been used "to achieve an unlawful end, or [to compel the plaintiff] to do something that he could not legally be compelled to do." *Id.* (citation omitted). For purposes of the tort, process is defined as:

> "[P]rocess which emanates from or rests upon court authority, and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act." 1 Am.Jur.2d Abuse of Process section 2. Process refers to papers issued by a court to bring a party or property within its jurisdiction.

*Misischia v. St. John's Mercy Med. Ctr.*, 30 S.W.3d 848, 862 (Mo. Ct. App. 2000) (internal citation omitted) (*abrogated on other grounds by Ellison v. Fry*, 437 S.W.3d 762 (Mo. 2014)).

The Plaintiffs do not allege that process was issued as a result of any action taken by Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Corporal Stacks, Trooper Fick,

26

Captain Eberhard, and Lieutenant Herndon. The Plaintiffs do not allege that they were compelled by process to do anything. Moreover, they point to no authority holding that law enforcement's investigatory activities can constitute the common law tort of abuse of process, and the Court is aware of none.

The Count IX claims against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Corporal Stacks, Trooper Fick, Captain Eberhard, and Lieutenant Herndon are dismissed with prejudice.

## III.     Conclusion

Defendant Jones' motion to dismiss [Doc. 60] is granted, and Counts III and IX against him are dismissed with prejudice.

The motion to dismiss filed by Defendants Colonel Replogle,  Major Johnson, Captain Kindle, Lieutenant Clardy, Corporal Echternacht, Corporal Stacks, Sergeant Barbour, Sergeant Chris Harris, Trooper Fick, Captain Eberhard, Lieutenant Herndon, the Missouri State Highway Patrol, and the State of Missouri [Doc. 58], is granted in part and denied in part:

- The motion is denied with respect to Count II, Civil Rights Violation under 42 U.S.C. § 1983, and Count III, Civil Conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986;

- The motion is granted with respect to Count VI, Negligent Hiring, Training, and Supervision under Missouri law, and the claims against Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour in their individual capacities, and State of Missouri, and the Missouri State Highway Patrol are dismissed with prejudice;

- The motion is granted with respect to Count VII, Negligent Hiring, Training, and Supervision under Missouri law, and the claims against Defendants Replogle, Eberhard, and Herndon in their individual capacities are dismissed with prejudice; and

- The motion is granted with respect to Count IX, Conspiracy to Commit Abuse of Process, and the claims against Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, Barbour, Harris, Stacks, Fick, Eberhard, and Herndon are dismissed with prejudice.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  June 15 , 2015
Jefferson City, Missouri

Case 2:14-cv-04316-NKL   Document 95   Filed 06/15/15   Page 28 of 28