**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| CRAIG E. ELLINGSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-04316-NKL |
| | ) | |
| ANTHONY C. PIERCY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# ORDER

Plaintiffs Craig, Sherry, and Jennifer Ellingson, the surviving parents and sibling of Brandon Ellingson, brought suit against Defendants, all state or county employees, for violations of federal and state law while Brandon was in custody and during the subsequent investigation into his death. Before the Court is Defendant Anthony Piercy's Motion for Partial Judgment on the Pleadings, [Doc. 158], and Defendants Robert Replogle, J. Bret Johnson, Gregory Kindle, Darewin Clardy, Eric Stacks, Missouri State Highway Patrol, and State of Missouri's Motion for Partial Judgment on the Pleadings, [Doc. 134].

For the reasons discussed below, both motions are granted in part and denied in part.

## I.      Background[1]

On May 31, 2014, Brandon Ellingson was operating a boat with several friends on Lake of the Ozarks in Morgan County, Missouri.    Around 5:00 p.m. that afternoon, Trooper Piercy stopped Brandon's boat for possible vehicle registration and littering violations, and during this stop Piercy had Brandon board the patrol boat to perform a sobriety test.   Brandon was fully cooperative throughout the process.   After performing the test, Piercy suspected Brandon was intoxicated and decided to take him into custody. Piercy placed double-lock handcuffs on Brandon's wrists, securing Brandon's arms behind his back.   Piercy then took a pre-buckled Type III life jacket and pulled it over Brandon's head, leaving the crotch strap unsecured.   Missouri State Highway Patrol policy required officers to use a Type I or Type II personal flotation device when securing a handcuffed person.   While there were multiple Type I devices on Piercy's patrol boat, Piercy did not use this equipment.

Piercy positioned Brandon leaning against a flipped-up seat on the right side of the boat.   Piercy then proceeded to drive the patrol boat to the MSHP's satellite office at H. Toad's Bar & Grill.   Despite heavy traffic and rough waves on the lake, Piercy operated the boat at a high rate of speed, hitting a top speed that exceeded 46 miles per hour.   As a result, Brandon was involuntarily ejected from the boat, and his life jacket immediately separated from his body because it had been improperly secured.   Piercy later falsely stated that Brandon had voluntarily jumped from the moving boat.

---

[1]      These facts appear in Plaintiffs' Complaint.   For purposes of deciding the Defendants' motions for partial judgment on the pleadings, the Court accepts Plaintiffs' factual allegations as true and construes them in the light most favorable to Plaintiffs. *See Faibisch v. Univ. of Minn.*, 304 F.3d 797, 803 (8th Cir. 2002).

After observing Brandon in the water, Piercy accidentally killed the boat's engine while trying to put the vehicle into reverse. He did not activate the boat's sirens or alert nearby witnesses to the situation. Instead, Piercy restarted the engine, drove to Brandon, and attempted rescuing Brandon by using a dock hook despite knowing that Brandon was handcuffed and could not grab the object. Piercy eventually jumped into the water at the urging of nearby witnesses. When he did so, Piercy was wearing a Type V personal flotation device, which he mistakenly believed would auto-inflate. Although Piercy states he was able to grab Brandon, his Type V device did not inflate and Piercy lost his grip. Brandon remained submerged under the water and died of asphyxiation due to drowning.

At the time of Brandon's death, Piercy was a Missouri State Trooper serving part-time with the Water Patrol Division. Piercy was primarily a road officer, but in the previous year, 2013, he had attended MSHP's water school to receive Water Patrol training. Piercy received insufficient training in the classroom and on the water; Plaintiffs allege he was insufficiently trained to swim, operate a boat, operate other equipment, and conduct a water rescue without supervision.

The training program Piercy attended had been approved by Colonel Ronald Replogle and Major J. Bret Johnson, even though both knew it was rushing inadequately trained officers, such as Piercy, into marine enforcement duties. Captain Gregory Kindle and Lieutenant Darewin Clardy further knew that Piercy could only swim at a low proficiency and could not properly operate his patrol boat.

Plaintiffs allege that after Brandon's death, several Defendants conducted a deficient investigation that attempted to suppress facts surrounding the death and shield Piercy from liability. Lieutenant Justin McCullough and Corporal David Echternacht prepared a Marine Accident Investigation Report stating that Brandon voluntarily left the boat, even though both knew he had been involuntarily ejected. Replogle and Captain Sarah Eberhard appointed Corporal Eric Stacks the lead marine investigator into Brandon's death, despite knowing he had no training in marine investigations. Stacks then "intentionally and deliberately excluded relevant information provided by [Randy] Henry, a two-decade veteran of the Water Patrol Division, from [his] investigate report."[2] [Doc. 45, p. 12, ¶ 72]. Stacks further, along with Sergeant Chris Harris and Eberhard, "intentionally attempted to steer witnesses into making statements favorable to Piercy's actions and which contradicted known admissions by Piercy." [Doc. 45, p. 13, ¶ 79]. Additionally, Replogle and MSHP violated MSHP policies when reviewing the final investigative reports.

Following the investigation, Sergeant Donald Barbour, Kindle, and Clardy stated at a meeting that the investigation had been "handled." [Doc. 45, p. 15, ¶ 87]. A coroner's inquest was held on September 4, 2014. At the inquest, Clardy decided not to call Randy Henry to testify, even though Henry had spoken with Piercy on the night of Brandon's death. Stacks also withheld a video recreation which demonstrated the patrol boat's high rate of speed.

---

[2]      Sergeant Harris is not a defendant in this suit.

4

Plaintiffs filed their suit on December 5, 2014. The Court dismissed several of Plaintiffs' claims in orders entered on June, 15, 2015 [Doc. 95] and on June 30, 2015 [Doc. 96]. Plaintiffs further dismissed several claims on February 20, 2016 [Doc. 162]. Accordingly, the following claims are still pending:

- Count I: Civil Rights Violation under 42 U.S.C. § 1983. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually).

- Count II: Civil Rights Violation under 42 U.S.C. § 1983. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Colonel Replogle, Major Johnson, Captain Kindle, and Lieutenant Clardy (individually). Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually).

- Count III: Civil Conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Captain Kindle, Lieutenant Clardy, and Corporal Stacks (individually). Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Trooper Fick, Captain Eberhard, and Lieutenant Herndon (individually).

- Count IV: Negligence. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually and in his official capacity).

- Count V: Negligence Per Se.  Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually and in his official capacity).

- Count VI: Negligent Hiring, Training, and Supervision (of Trooper Piercy) under Mo. Rev. Stat. § 537.080.  Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Colonel Replogle, Major Johnson, Captain Kindle, Lieutenant Clardy, Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (in their official capacities).

- Count VII: Negligent Hiring, Training, and Supervision (of Corporal Stacks and Sergeant Harris) under Mo. Rev. Stat. § 537.080.  Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Colonel Replogle, Captain Eberhard, and Lieutenant Herndon (in their official capacities).

- Count VIII: Respondeat Superior under Mo. Rev. Stat. § 537.080.  Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against the State of Missouri and the MSHP.

- Count IX: Conspiracy to Commit Abuse of Process.  Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually and in his official capacity).

## II.    Discussion

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is appropriate "when there is no dispute as to any material facts and the moving

party is entitled to judgment as a matter of law." *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006). In assessing this motion, a court applies "the same standard used to address a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

Accordingly, the Defendants are entitled partial judgment on the pleadings if Plaintiffs' complaint fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### A. Jennifer Ellingson's Claims

Defendants first argue that Plaintiff Jennifer Ellingson lacks standing to assert several claims in this litigation. Defendant Piercy asks the Court to dismiss Jennifer from Count I. Plaintiffs have not contested Piercy's argument, so accordingly, this claim is dismissed with prejudice.

Defendants Replogle, Johnson, Kindle, Clardy, Stacks, Missouri State Highway Patrol, and State of Missouri have likewise challenged Jennifer's claims asserted against them under Counts II, III, VI, VII, and VIII. Because Jennifer has since stipulated to dismiss these claims, *see* [Doc. 162], Defendants' motion to dismiss them is denied as moot.

### B. Count I, Count II; Civil Rights Violations

In the first two counts of their complaint, Plaintiffs allege civil rights violations against Defendant Piercy (Count I) and Defendants Replogle, Johnson, Kindle, and Clardy (Count II) under 42 U.S.C. § 1983. Section 1983 was designed to provide a

7

"broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). To state a Section 1983 claim, a plaintiff must allege (1) that "the conduct complained of was committed by a person acting under color of state law" and (2) that the "conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Because neither party contests that the Defendants were acting under the color of state law, the Court must determine whether Plaintiffs have alleged that the Defendants deprived them of federally-protected civil rights. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).

### 1. Fifth Amendment Violations

Defendants Piercy, Replogle, Johnson, Kindle, and Clardy move for their dismissal from Counts I and II as premised on a violation of the Fifth Amendment. Plaintiffs have not contested any of the Defendants' Fifth Amendment arguments. Accordingly, these claims against Defendants Piercy, Replogle, Johnson, Kindle, and Clardy are dismissed with prejudice.

### 2. Fourth Amendment Violations Against Defendant Piercy

Defendant Piercy argues that Plaintiffs also cannot maintain a claim against him under the Fourth Amendment. In a Section 1983 action premised on a Fourth Amendment violation, a plaintiff must establish that (1) "a seizure occurred" and (2) "the seizure was unreasonable." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008). A seizure occurs when "an officer restrains an individual's liberty through physical force or

a show of authority." *Id.* If the individual does not reasonably feel free to leave, he has been seized, and this seizure continues until he is at "liberty to ignore the police presence and go about his business." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988-89 (8th Cir. 2009) (*quoting Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

Piercy admits that he seized Brandon at the time of his arrest. *See United States v. Pratt*, 355 F.3d 1119, 1122 (8th Cir. 2004) (when an officer has probable cause, "the term 'seizure' is synonymous with the term 'arrest' under the Fourth Amendment"). Piercy further admits in his reply brief that this seizure continued after the arrest itself was completed. *See Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011) (a Fourth Amendment seizure can be premised on the manner in which an individual is transported following his arrest). Accordingly, because Brandon could not conceivably ignore Piercy's presence and go about his business while on the patrol boat, the seizure continued until the time of Brandon's drowning.

The Court now turns to the second step of this inquiry—whether Piercy's seizure of Brandon was reasonable. The reasonableness of a Fourth Amendment seizure is assessed under an objective standard: it considers the officer's conduct from the "perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). *See also Davis v. White*, 794 F.3d 1008, 1011 (8th Cir. 2015) ("objective reasonableness" standard applies to Fourth Amendment claim asserted by post-arrest detainee). In conducting this assessment, a court "look[s] at the totality of the circumstances and focus[es] on factors such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety

of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Taking into account the circumstances of Brandon's case, the Court cannot say that Piercy seized Brandon in an objectively reasonable manner. At the time of his seizure, Brandon did not pose an immediate threat to Piercy or to the safety of any third party. He was not suspected of a violent crime, but rather of a misdemeanor, and he was not attempting to evade arrest. *See Brown v. City of Golden Valley*, 574 F.3d 491, 496-97 (8th Cir. 2009) (a seizure is less objectively reasonable where the suspected crime was a misdemeanor and the suspect was not posing a safety threat or attempting to flee). Simply put, nothing about Brandon and Piercy's interaction suggested a "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 397.

Despite these controlled circumstances, however, a jury could find Piercy made a series of decisions during Brandon's seizure that, taken together, fell far outside the scope of reasonable officer conduct. Plaintiffs allege that after handcuffing Brandon behind his back—a measure that prevented Brandon from swimming or holding onto the patrol boat—Piercy improperly secured Brandon in a life vest that would not support him in water and, moments afterwards, positioned Brandon against a flipped-up seat that would not stabilize him during transit. Piercy then exacerbated the consequences of these choices by driving across the lake at a high rate of speed—a decision wholly unreasonable in light of his other actions.

The Eighth Circuit has found that an officer's erratic driving can give rise to a Fourth Amendment violation. In *Chambers*, the plaintiff alleged an unreasonable seizure

where, in part, the officer "was driving so erratically that [the plaintiff] was jerked roughly back and forth in his car set while his head was positioned adjacent to the dashboard." *Chambers*, 641 F.3d at 905. The Eighth Circuit found that the plaintiff had properly alleged a Fourth Amendment violation, even though he did not suffer a significant injury from the episode. Brandon, meanwhile, suffered a fatal injury as a result of Piercy's erratic driving while he was restrained. *See Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003) (the injury suffered is relevant in determining reasonableness of the seizure). Under these circumstances, a jury could find a Fourth Amendment violation.

Piercy argues "there is no right to be secured in a particular manner under the Fourth Amendment." [Doc. 159, p. 5] (*citing Purvis v. City of Orlando*, 273 F. Supp. 2d 1321 (M.D. Fla. 2003); *Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002)). Yet the cases he cites do not stand for this broad proposition. In *Purvis*, a pretrial detainee was not handcuffed while being taken to a patrol vehicle. Before the officers were able to place the detainee in the vehicle, he fled, and during the subsequent pursuit he drowned after entering a retention pond. The District Court for the Middle District of Florida dismissed the detainee's Fourth Amendment claim because "[t]he Fourth Amendment . . . does not guarantee the right to be searched and seized." *Purvis*, F. Supp. 2d at 1326. In the present case, conversely, the parties do not dispute whether Brandon should have been seized or whether Piercy should have handcuffed him as part of this seizure. Rather, the dispositive question is merely whether the seizure, once it occurred, was reasonable.

11

Likewise, in *Proffitt*, the plaintiff was arrested and placed in handcuffs, but the officer did not fasten his seatbelt or shackle his feet within the police vehicle. The plaintiff was able to grab the steering wheel and veer the vehicle into a ditch. An altercation then ensued between the plaintiff, the officer, and a bystander. Eventually, after being placed in a chokehold, the plaintiff died from the effect of pressure on his neck. In dismissing his constitutional claim, the Seventh Circuit observed that "[a]lthough there is no constitutional right to be shackled, once [the plaintiff] was in police custody the police had a duty to provide for his safety." *Proffitt*, 279 F.3d at 506. This statement applies equally to Brandon's case. Although Brandon had no constitutional right to be arrested and handcuffed, Piercy owed him a duty, once that arrest took place, not to unreasonably endanger Brandon's safety.

Moreover, in both *Purvis* and *Proffitt*, the alleged constitutional injury occurred after the detainee attempted to flee police custody. Because Brandon did not resist arrest or attempt to flee from Piercy, as discussed above, his case is instead more analogous to those where an individual offers no resistance during his arrest. *See Kukla v. Hulm*, 310 F.3d 1046 (8th Cir. 2002). In *Kukla*, a truck driver was placed under arrest for failing to produce his logbook during an inspection. The driver complied and did not resist the arrest, but the officer nevertheless pushed him against the truck and handcuffed him so tightly that his wrist broke. The Eighth Circuit concluded: "[c]onsidering the circumstances, including the offense at issue, the lack of an immediate safety threat, and the lack of active resistance to arrest, we agree that there is a genuine issue of whether the

12

force used was excessive, so the district court properly denied summary judgment." *Id.* at 1050.

In Brandon's case as well, the circumstances simply do not justify the choices Piercy made while restraining Brandon. Although Plaintiffs do not allege that Brandon's handcuffs were too tight, they argue that Brandon was handcuffed in an unreasonable manner when considered in light of how Piercy applied the life vest, positioned Brandon in the patrol boat, and drove across the water. As a result of these decisions, a jury could find that Brandon was placed in a situation significantly more dangerous than the one assessed in *Kukla*. Accordingly, Plaintiffs have sufficiently stated a Section 1983 claim against Piercy premised on a violation of Brandon's Fourth Amendment rights.

Piercy nevertheless argues that he is shielded by qualified immunity. In Section 1983 actions, qualified immunity protects government officials from suit unless their conduct violated a clearly established right of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, when existing constitutional precedent is "beyond debate," an official is reasonably aware he has violated a clearly-established right and cannot shield himself with qualified immunity. *City & Cnty. of S.F., Calif. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015) (alteration in original) (citations omitted).

To determine whether precedent is beyond debate, the Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent,

and demanding that officials apply general, well-developed legal principles." *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989) (*quoting Lappe v. Loeffelholz*, 815 F.2d 1173, 1177 (8th Cir. 1987)) (internal quotation marks omitted). These legal principles can derive from "statutory and case precedent and well-established general principles of law." *Id*.

Having considered the precedent behind Plaintiffs' Fourth Amendment allegations, the Court finds it "beyond debate" that the erratic operation of a police vehicle—whether a car or a boat—can constitute an objectively unreasonable seizure. Eighth Circuit precedent has established that the manner in which an offer operates his vehicle may cause a Fourth Amendment violation. *Chambers*, 641 F.3d at 905. *See also Brown v. Missouri Dep't of Corr.*, 353 F.3d 1038, 1040 (8th Cir. 2004) (plaintiff alleged a constitutional violation where the officer drove erratically after failing to secure him properly). While the Eighth Circuit has not discussed Fourth Amendment seizures in the context of a water transport, Plaintiffs allege that Piercy drove at speeds exceeding 40 miles per hour across a crowded lake in a non-emergency situation. Such driving would bring Piercy's actions in line with those found unreasonable in *Chambers*: in both cases, a restrained suspect was subject to erratic driving, causing him physical injury. *See Chambers*, 641 F.3d at 908.

Further, the Eighth Circuit has clearly-established that actions causing injury to a restrained, subdued suspect are unreasonable when the circumstances of the case offer no countervailing justification for the officer's decisions. *See Brown*, 574 F.3d at 496-97. This is especially true where the injury suffered is significant. *Crumley*, 324 F.3d at

1007. In such situations, Eighth Circuit precedent has also established that the manner in which an individual is restrained may give rise to a Fourth Amendment violation. *Kukla*, 310 F.3d at 1050; *Littrell v. Franklin*, 388 F.3d 578, 586 (8th Cir. 2004) (*citing Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) (finding that the manner of restraint may be unreasonable under the circumstances)).

The novel factual elements of Brandon's case—that he was being transported in a patrol boat across water and died by drowning—do not affect these underlying legal principles. The United States Supreme Court has "expressly rejected a requirement that previous cases be 'fundamentally similar.'" *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). Instead, because the central question of this inquiry is "whether the state of the law at the time gave the officials fair warning their conduct was unlawful," the "contours of a right" may be sufficiently clear even if the factual situations are different. *Sisney v. Reisch*, 674 F.3d 839, 845 (8th Cir. 2012) (citations omitted). Although Piercy argues there is no clearly-established constitutional right where someone is "improperly and incorrectly secured during transport over water after his arrest," [Doc. 159, p. 10], Piercy does not show how the legal principles differ when a suspect is transported in a boat, as compared to cases where the suspect is transported in a car. The Court cannot say as a matter of law that "a reasonable officer could have believed that his conduct was justified." *Sheehan*, 135 S. Ct. at 1777.

Consequently, Piercy had fair warning that his conduct was unlawful and cannot shield himself from Plaintiffs' Section 1983 claim alleging Fourth Amendment violations.

15

### 3. Fourth Amendment Violations Against Defendants Replogle, Johnson, Kindle, and Clardy

Defendants Replogle, Johnson, Kindle, and Clardy argue that "Plaintiffs have not alleged that these individual Defendants (as opposed to Trooper Piercy) performed an unreasonable search and seizure of Brandon and, accordingly, have failed to state a claim for violation of the Fourth Amendment against these Defendants." [Doc. 135, p. 11].

Plaintiffs do not dispute that these defendants did not directly participate in Brandon's seizure. Even so, a supervisor may still be held liable under Section 1983 "if his failure to train or supervise the offending actor caused the deprivation." *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806-07 (8th Cir. 1994) (*citing City of Canton*, 489 U.S. 378, 388 (1989)). Therefore, even if Defendants Replogle, Johnson, Kindle, and Clardy did not seize Brandon, it is well-established that their training or supervision of Piercy could rise to the level of a Fourth Amendment violation nevertheless.

The Court has reviewed these defendants' Suggestions in Support, [Doc. 135], and it finds they have asserted no other grounds for dismissing Plaintiffs' Fourth Amendment allegations. Accordingly, Plaintiffs have stated a Section 1983 claim for Fourth Amendment violations against Defendants Replogle, Johnson, Kindle, and Clardy.

### 4. Fourteenth Amendment Estate Claim Against Defendant Piercy

Plaintiffs also claim civil rights violations under the Due Process Clause of the Fourteenth Amendment. Plaintiffs assert these allegations both individually and, on the part of Plaintiffs Craig and Sherry, as co-administrators of Brandon's estate. Piercy asks the Court to dismiss Plaintiffs' estate claim asserted against him.

16

The Due Process Clause of the Fourteenth Amendment "forbids the [s]tate itself to deprive individuals of life, liberty, or property without due process of law." *DeShaney*, 489 U.S. at 195. Accordingly, the clause imposes a duty upon state actors to protect or care for citizens "in custodial and other settings in which the state has limited the individuals' ability to care for themselves." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992). No party disputes that Brandon was a pretrial detainee within Piercy's custody during the relevant time period.

To succeed on their Fourteenth Amendment claim, Plaintiffs must show that Piercy's actions were "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015).[3] As with a claim under the Fourth Amendment, "objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (*quoting Graham*, 490 U.S. at 396). "A court must make [its] determination from the perspective

---

[3]     In *Kingsley*, the United States Supreme Court held that Fourteenth Amendment excessive force claims are properly analyzed under the "objective reasonableness" standard. *Kingsley*, 135 S.Ct. at 2472-73. *See also Davis v. White*, 794 F.3d 1008, 1011 (8th Cir. 2015) (noting that *Kingsley* applies to excessive force due process claims). However, it remains an open question whether *Kingsley*'s standard also applies to conditions of confinement claims under the Fourteenth Amendment. The question is not one the Court must presently decide. Even if the Brandon's Fourteenth Amendment claim is analyzed under the deliberate indifference standard, *see Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006), Plaintiffs have offered sufficient allegations to survive a motion for judgment on the pleadings. Plaintiffs allege that Piercy knew Brandon was handcuffed when he placed Brandon against a flipped-up seat and then operated the patrol boat at high speeds across crowded, choppy water. Plaintiffs further allege that after Brandon fell into the lake, Piercy did not seek assistance or attempt a water rescue until nearby witnesses urged him to do so, despite knowing that Brandon was handcuffed and knowing he could not grab the dock hook Piercy initially fished into the water.
        These allegations are sufficient at this stage to establish that Piercy knew of an excessive risk— that a handcuffed, potentially inebriated person in his custody may drown if ejected into the water—and then proceeded to disregard this risk by leaning Brandon against a flipped-up seat, driving at high speeds across the lake, and delaying a water rescue after Brandon was ejected from the patrol boat. As in the case of a medical emergency, these risks are obvious even to a layperson such that a jury could find deliberate indifference. *See Schaub v. VonWald*, 638 F.3d 905, 913 (8th Cir. 2011).

17

of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

Considering the perspective of a reasonable officer on the scene, the Court again cannot say that the sum of Piercy's actions were objectively reasonable. When taking Brandon into his custody, Piercy handcuffed Brandon behind his back, thereby significantly limiting Brandon's capacity to protect himself during a water transport. Nevertheless, Piercy secured Brandon with a flotation device that would not keep him afloat, positioned Brandon against a flipped-up seat that would not keep him restrained, and drove across the lake at a speed that could dislodge a person, such as Brandon, who was unable to hold onto the vehicle. These are not reasonable choices. Rather, Piercy's alleged actions created, and then ignored, an obvious danger to the person held within his custody. Regardless of whether Plaintiffs can ultimately succeed on their claim, they have sufficiently alleged a due process violation.

Piercy argues he is nevertheless shielded by qualified immunity. Yet having examined the precedent behind Plaintiffs' Fourteenth Amendment allegations, the Court finds it "beyond debate" that "[w]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (*quoting Whitley v. Albers*, 475 U.S. 312, 327 (1986)). *See also Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) ("[T]he state owes a duty to protect those in its custody."). Further, the Eighth Circuit has found that a detainee's Fourteenth Amendment rights can be violated by the manner in which he is

18

transported. *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 904 (8th Cir. 1999).

*See also Brown v. Missouri Dep't of Corr.*, 353 F.3d 1038 (8th Cir. 2004); *Brown v. Morgan*, 39 F.3d 1184 (8th Cir. 1994).[4] A long line of Eighth Circuit cases has also established that a due process violation can occur where an official's action puts someone "at a significant risk of serious, immediate, and proximate harm." *Estate of Johnson v. Weber*, 785 F.3d 267, 272 (8th Cir. 2015) (*quoting Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011)).

In light of this precedent, Piercy is not entitled qualified immunity on Plaintiffs' Fourteenth Amendment claim.

### 5. Fourteenth Amendment Individual Claim Against Defendants Piercy, Replogle, Johnson, Kindle, and Clardy

Notwithstanding Plaintiffs' estate claim under the Fourteenth Amendment, the Defendants argue that Plaintiffs cannot individually maintain a Fourteenth Amendment claim on their own behalf. Presently, Plaintiffs are asserting that Defendants Piercy, Replogle, Johnson, Kindle, and Clardy, through their actions contributing to Brandon's death, violated Craig and Sherry's constitutionally-protected liberty interest in maintaining a relationship with their son.

The United States Supreme Court has established that parents have a fundamental constitutional liberty interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This liberty interest is protected by the Due Process

---

[4]       While both *Brown* cases were apparently examined under the Eighth Amendment, "the due process rights of a [person in police custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Clause because it is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal citations omitted). The Supreme Court has not, however, decided whether a parent's interest in the "care, custody, and control" of her child extends to the companionship of an adult child over whom she no longer exercises actual custody and control.

Brandon was twenty years old—an adult under both Iowa and Missouri law—at the time of his death in 2014. Pointing to this fact, the Defendants argue that Craig and Sherry lack a liberty interest in Brandon's companionship, especially considering Plaintiffs do not allege the Defendants acted with the intention of severing the parent-child relationship. This argument reflects the position adopted by the majority of circuit courts. *See Russ v. Watts*, 414 F.3d 783, 786-90 (7th Cir. 2005) ("[S]everal of our sister circuits have considered whether the Constitution protects a parent's relationship with his adult children in the context of state action which has the incidental effect of severing that relationship. No other court of which we are aware has allowed a parent to recover for the loss of his relationship with his child in these circumstances."). *See also McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003) ("[T]he fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child."); *Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986); *Robertson v. Hecksel*, 420 F.3d 1254, 1258-60 (11th Cir. 2005).

In response, Plaintiffs rely on *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159 (9th Cir. 2013), which notes in dicta that, "in past cases, we have recognized a

20

parent's right to a child's companionship without regard to the child's age." *Id.* at 1169. The *Johnson* court proceeded to observe, however, that the issue was not properly raised in the district court and therefore it concluded only that "in a future appeal, we may have occasion to consider it." *Id.* at n.3. This language does not support Plaintiffs' argument that "the Ninth Circuit . . . recognizes parents have a Fourteenth Amendment right to the companionship of an adult child." [Doc. 161, p. 13].

The Eighth Circuit has not directly addressed the question. In *Mattis v. Schnarr*, 502 F.2d 588, 593-95 (8th Cir. 1974), the Eighth Circuit found that the plaintiff had a fundamental liberty interest in his relationship with his son, who had been shot and killed by the defendant, a police officer, while attempting to evade arrest. The court wrote: "[t]he familial relationship between parent and child is fundamental to our civilization. The family is the foundation of society and hence the state. . . We do not believe that the Constitution excludes this fundamental relationship from its protection." *Id.* at 594. While this holding is stated in broad terms, in does not indicate, as Plaintiffs argue, that the Eighth Circuit has recognized a liberty interest in a parent's relationship with an adult child. The plaintiff in *Mattis* was eighteen years old—a minor under Missouri law at that time. Further, in explaining its decision, the *Mattis* court emphasized a parent's "right[] to . . . raise a family," and more specifically, the plaintiff's "fundamental right to raise his son." *Id.* at 594-95. The Court thus declines to extend *Mattis*' reasoning to the present case which involves an adult child over which the parent no longer has control.

More instructive is the Eighth Circuit's decision in *Harpole v. Arkansas Dep't of Human Servs.*, 820 F.2d 923 (8th Cir. 1987). In *Harpole*, a grandmother sued the state

21

department of human services after her grandson, an infant, died from apnea. Among other claims, the plaintiff alleged that the department violated her Fourteenth Amendment rights by repeatedly discharging the infant to his mother in the weeks preceding his death despite the possibility he was being neglected. The Eighth Circuit disagreed and dismissed the claim. In doing so, it cited at length to *Ortiz v. Burgos*, the First Circuit case that found no constitutionally-protected liberty interest in the companionship of an adult child. *See Ortiz*, 807 F.2d at 8. *Ortiz* "found a significant difference between government actions which directly affect the relationship between a parent and a minor child and actions which indirectly affect the relationship between parent and adult child." *Harpole*, 820 F.2d at 928 (*citing Ortiz*, 807 F.2d at 8). The *Harpole* court agreed with *Ortiz* that recognizing a protected liberty interest in the latter category "would constitutionalize adjudication in a myriad of situations we think inappropriate for due process scrutiny." *Id*. (*quoting Ortiz*, 807 F.2d at 9). As such, the *Harpole* court concluded, "[p]rotecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct." *Id*.

While *Harpole* involved the relationship between a grandmother and infant, not a parent and adult son, it expressly endorsed the First Circuit's reluctance to protect a parent's relationship with his adult child. Moreover, in declining to compensate the plaintiff for "wrongful state conduct, especially when the loss is an indirect result of that conduct," *id*., the Eighth Circuit appeared to join the majority position in requiring a state action that has the direct intent of affecting the parent-child relationship. *See Helleloid v.*

*Indep. Sch. Dist. No. 361*, 149 F. Supp. 2d 863, 874 (D. Minn. 2001) ("In our considered view, the Court's analysis, in *Harpole*, inclusive of its favorable discussion of *Ortiz*, reflects that the Eighth Circuit has joined with the Fourth, First, and Sixth Circuits, in requiring a parent . . . to demonstrate that the State action was aimed directly at the parent-child relationship.").

As such, the Court will adhere to *Harpole*'s language and the majority view. Plaintiffs Craig and Sherry have alleged that the Defendants indirectly severed their relationship with their adult son, and so they cannot maintain a personal claim under the Fourteenth Amendment.

### C. Count III; Civil Conspiracy

In Count III of their complaint, Plaintiffs allege that the Defendants conspired to deprive them of their constitutional rights in the aftermath of Brandon's death. Plaintiffs allege that the purpose of this conspiracy was "to cover up the cause of Brandon's death while in the custody of Defendant Piercy and the Missouri State Highway Patrol, in order to deprive the Plaintiffs of their constitutional rights, including but not limited to their right to seek redress for their grievances through the courts, right to equal protection under the law, and right to due process of law." [Doc. 45, p. 22, ¶ 111]. Accordingly, Plaintiffs assert a civil conspiracy claim under 42 U.S.C. §§ 1983, 1985, and 1986. Defendants Piercy, Kindle, Clardy, and Stacks ask the Court to dismiss the Section 1985 and 1986 claims. Additionally, Defendant Piercy asks the Court to dismiss him from Plaintiffs' conspiracy claim under Section 1983.

### 1. Section 1985

23

Plaintiffs clarify in their briefing that they are alleging, under Section 1985, a conspiracy to deprive them of equal privileges and immunities under the laws. 42 U.S.C. § 1985(3). To state a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy, (2) for the purpose of depriving another of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or the deprivation of a legal right." *Federer v. Gephardt*, 363 F.3d 754, 757-58 (8th Cir. 2004) (citations omitted). Under the second element, the parties agree that a plaintiff must offer "proof of a class-based animus." *Id.* (*citing Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."). Therefore, in order to maintain a claim under Section 1985(3), Plaintiffs must allege some class-based animus behind the conspiracy to cover up Brandon's death.

In their briefing, Plaintiffs propose two possible classes against which the Defendants exhibited animus. First, Plaintiffs describe a class of "pretrial detainees/arrestees." [Doc. 161, p. 16]. Second, Plaintiffs propose a class of "persons killed while in law enforcement custody." [Doc. 161, p. 18]. Both of these classes, however, fail to describe "a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors"—a bar the United States Supreme Court has found necessary but not sufficient to maintain a Section 1985(3) claim. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (finding that "class"

24

"unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors").

Plaintiffs cite cases from the Eighth Circuit and other federal circuits where a variety of groups have been deemed a class for purposes of Section 1985(3). *See Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973); *Azar v. Conley*, 456 F.2d 1382 (6th Cir. 1972); *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973); *Harrison v. Brooks*, 446 F.2d 404 (1st Cir. 1971). Yet all of these groups shared a common element: they were all groups of affinity that the plaintiff chose to join. This fact is significant because, in order to create a class, "there must exist an identifiable body with which the particular plaintiff associated himself by some affirmative act." *Means v. Wilson*, 522 F.2d 833, 839 (8th Cir. 1975) (*quoting Westberry v. Gilman Paper Co.*, 507 F.2d 206, 215 (5th Cir. 1975)). The class further "must have an intellectual nexus which has somehow been communicated to, among and by the members of the group." *Id.* Plainly, Brandon did not affirmatively join a class of pretrial detainees or a class of persons killed while in law enforcement custody. He additionally did not communicate any intellectual nexus with other members of these groups. As such, Brandon was not part of a "class" for purposes of Section 1985, and so the Defendants could not have exhibited class-based animus against him.

Plaintiffs' conspiracy claim premised on a Section 1985(3) violation is dismissed against Defendants Piercy, Kindle, Clardy, and Stacks.

### 2. Section 1986

Plaintiffs have also alleged a civil conspiracy under Section 1986. "A section 1986 claim must be predicated upon a valid section 1985 claim." *Gatlin ex rel. Estate of Gatlin v. Green*, 362 F.3d 1089, 1095 (8th Cir. 2004). Therefore, because Plaintiffs cannot maintain a Section 1985 claim, their conspiracy claim premised on Section 1986 must also be dismissed against Defendants Piercy, Kindle, Clardy, and Stacks. *See Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002) ("Because the district court properly dismissed [plaintiff's] § 1985 claims, it also correctly dismissed [plaintiff's] § 1986 claims against the individual defendants.").

### 3. Section 1983

Finally, arguing that Plaintiffs have not sufficiently alleged his role in a civil conspiracy, Defendant Piercy urges the Court to dismiss him from Plaintiffs' conspiracy claim under Section 1983. To state a Section 1983 conspiracy claim, a plaintiff must allege "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Further, "[t]he plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

Piercy argues that Plaintiffs have failed to allege several of these elements. First, he contends Plaintiffs' complaint lacks an allegation that he joined in a conspiracy with the remaining defendants, and alternatively, even if it does, any such allegation is conclusory and speculative. To plead a defendant's role in a conspiracy, a plaintiff must

allege she joined a "meeting of the minds" with other conspirators. *Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988). A meeting of the minds requires at least some facts suggesting the defendants "reached an understanding" to violate a person's rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *see also Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985) ("[A]llegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds."). It does not, however, demand evidence that each participant in the conspiracy knew "the exact limits of the illegal plan." *White*, 519 F.3d at 816.

Plaintiffs' complaint alleges that Piercy provided false reports about the events leading to Brandon's death. *See* [Doc. 45, p. 9, ¶ 50]. In light of the allegations offered against other Defendants—several of whom, according to the complaint, also provided similar false reports for the express purpose of protecting Piercy from liability—this allegation is sufficient to suggest Piercy joined a meeting of the minds. Even if Piercy did not know the full extent of the alleged conspiracy, Plaintiffs' allegation carries enough specificity to indicate, at this state in the litigation, his participation in it.

Second, Piercy argues Plaintiffs have not alleged an "overt act" in furtherance of the conspiracy. Yet Plaintiffs' complaint alleges several such overt acts. As an example, Plaintiffs allege that relevant evidence and testimony was withheld at the coroner's inquest following Brandon's death. Because withholding information served the objective of protecting the Defendants from liability, it constituted an "overt act in furtherance of the conspiracy." *Askew*, 191 F.3d at 957.

Third, Piercy maintains that Plaintiffs cannot show this overt act injured them or that the alleged conspiracy, more generally, deprived them of any constitutional rights. *See id.* (*quoting Villanueva v. McInnis*, 723 F.2d 414, 416 (5th Cir. 1984) ("[I]t remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient . . . without a deprivation of a constitutional right or privilege, the defendant has no liability under § 1983.").  By conspiring to cover up Brandon's death, Plaintiffs argue, the Defendants attempted to deprive them of their right of access to the courts, a right recognized under the Constitution.[5]  *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  While Plaintiffs ultimately accessed the courts by filing their present suit, that outcome is not dispositive.[6]  Rather, because "[a]n individual is entitled to free and unhampered access to the courts," his right of access may be violated where officials act to "intimidate or chill his exercise of that right." *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986) (internal quotations omitted).  Regardless of whether the Defendants' alleged conspiracy succeeded, Plaintiffs claim that the Defendants acted to chill their access to the courts, conspiring to cover up Brandon's death for the purpose of preventing Plaintiffs from bringing a civil suit.  Moreover, Plaintiffs argue they were injured because the

---

[5]    The Court notes that federal courts have not conclusively agreed whether, or in what situations, this right falls under the First Amendment or the Due Process Clause.  *See Scheeler v. City of St. Cloud, Minn.*, 402 F.3d 826, 830 (8th Cir. 2005).  For present purposes, it is sufficient to acknowledge that the constitutional right of access to the courts is well-established.  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

[6]    Piercy cites *Hassuneh v. City of Minneapolis*, 560 F. Supp. 2d 764, 769 (D. Minn. 2008) as support for his argument that "Plaintiffs have filed this suit and are prosecuting it," which "alone merits dismissal of this claim."  [Doc. 159, p. 17].  However, *Hassuneh* does not broadly stand for this proposition.  The plaintiffs in *Hassuneh* claimed they had actually been denied access to the courts—a claim the District of Minnesota found "perplexing," *id.* at 769—whereas here Plaintiffs argue the Defendants chilled their access to the courts, not that their access was outright denied.

Defendants' conduct actually served to chill and delay their lawsuit. *See id.* (*citing Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir. 1976)) (holding "that [an] official's threat burdened and chilled the plaintiffs' right of access even if the threat was not actually effective").

This case is thus distinguishable from *Scheeler v. City of St. Cloud*, which Piercy relies upon for the proposition that "[plaintiffs] must show that the defendants acted with some intentional motivation to restrict their access to the courts." *Scheeler*, 402 F.3d at 830. In *Scheeler*, the Eighth Circuit found no allegation of a conspiracy to intentionally deny access because the plaintiffs argued only "that they could . . . prevail by showing that the defendants were deliberately indifferent to their right to access the courts." *Id*. Plaintiffs expressly claim here that "[t]he intent of the conspiracy was to deprive the Plaintiffs . . . of their civil rights." [Doc. 45, p. 22, ¶ 111].

Plaintiffs have stated a Section 1983 claim against Defendant Piercy for participating in a civil conspiracy.

### D. Count IV; Negligence Against Defendant Piercy

In Count IV, Plaintiffs allege that Piercy, acting in both his official and personal capacities, negligently caused Brandon's death. Specifically, Plaintiffs allege six instances where Piercy breached a duty of care he owed Brandon:

    a. By handcuffing his arms behind his back;
    b. By utilizing a Type III life jacket;
    c. By putting the Type III life jacket on him improperly;
    d. By operating the patrol boat at an excessive speed given the totality of conditions;
    e. By improperly seating him during transportation;

Case 2:14-cv-04316-NKL   Document 241   Filed 05/11/16   Page 29 of 36

      f.  By failing to know how assigned equipment functioned, including but not limited to the operation of a Type V personal flotation device.

[Doc. 45, p. 24, ¶ 119].

On the basis of sovereign and official immunity, Piercy argues that several of these grounds for negligence must be dismissed.

### 1. Official Capacity Claim

When an officer is sued in his official capacity, "the action . . . should be treated as a suit against the State." *Edwards v. McNeill*, 894 S.W.2d 678, 682 (Mo. Ct. App. 1995) (internal citations omitted). Therefore, because the State of Missouri enjoys sovereign immunity from common law claims, a tort claim against an officer in his official capacity is barred unless sovereign immunity has been waived. *Martin v. City of Washington*, 848 S.W.2d 487, 490 (Mo. banc 1993). Missouri has waived sovereign immunity for "tort claims arising from the negligent operation of motor vehicles by public employees and from the dangerous condition of a public entity's property." *Edwards*, 894 S.W.2d at 682 (*citing* Mo. Rev. Stat. § 537.600.1). This waiver must be strictly construed. *Bartley v. Special School District of St. Louis County*, 649 S.W.2d 864, 870 (Mo. banc 1983).

Piercy does not dispute that Plaintiffs' negligence claim involves the operation of a motorized vehicle—the patrol boat. *See State ex rel. Metro. St. Louis Sewer Dist. v. Sanders*, 807 S.W.2d 87 (Mo. banc 1991) (sovereign immunity is waived for injuries "arising out of the operation of motor vehicles or motorized vehicles"). Plaintiffs, accordingly, have offered a basis for waiving sovereign immunity in this case. The Court

will not at this stage parse out what specific facts will be included in a negligence jury instruction. There is clearly a submissible case.[7]

### 2. Personal Capacity Claim

Piercy also challenges part of Plaintiffs' negligence claim stated against him in his personal capacity. Arguing that he is protected by official immunity as to two alleged instances of negligence—(1) the manner in which Brandon was handcuffed and (2) the manner in which Brandon was seated on the patrol boat—Piercy asks the Court to dismiss those components of the negligence claim.

The doctrine of official immunity "protects public officials from liability for alleged acts of ordinary negligence committed during the course of their official duties for the performance of discretionary acts." *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006). Accordingly, if an official performs a discretionary act within the scope of his duty, he is entitled immunity. *Id.* Yet if he commits a tort while "acting in a ministerial capacity," the official immunity doctrine does not apply. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008).

Neither party disputes that Piercy was acting within the scope of his official duty when he arrested Brandon. They disagree, however, whether Piercy was performing a discretionary or ministerial act when he handcuffed Brandon and then seated Brandon in the patrol boat.

---

[7]    In light of this finding, the Court will not address the parties' arguments concerning the "dangerous condition" exception.

Under Missouri law, a discretionary act is one that "requires the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or course pursued." *Kanagawa v. State By & Through Freeman*, 685 S.W.2d 831, 836 (Mo. banc 1985), *overruled on other grounds by Alexander v. State*, 756 S.W.2d 539 (Mo. banc 1988). A ministerial act is one "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Id*. To determine whether an act is discretionary or ministerial, a court considers "the degree of reasoning and judgment required." *Southers*, 263 S.W.3d at 610. This assessment requires a case-by-case determination based upon "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id*.

Considering the circumstances of Brandon's case, the Court finds that Piercy was not performing a discretionary act when he handcuffed Brandon and then seated Brandon in the patrol boat. At this point in their interaction, Brandon had already been placed under arrest and was being fully cooperative. Piercy's task was not to exercise professional judgment in restraining Brandon; rather, he was simply charged with a minimum expectation of safety, obvious to a professional or a layperson—an expectation that Brandon be either (1) seated properly in the boat, (2) given the ability to hold onto the boat, or (3) outfitted with a life vest that would keep his head above water. *See*

*Fonseca v. Collins*, 884 S.W.2d 63, 67 (Mo. Ct. App. 1994) (applying "common sense" in deciding whether a police officer had discretion).

While Piercy had discretion between these options in choosing *how* to safely restrain Brandon, he is not shielded for his decision whether, as an initial matter, Brandon would be safely restrained. Piercy was not required to act "boldly and quickly" in making this decision. *Brown v. Tate*, 888 S.W.2d 413, 415 (Mo. Ct. App. 1994). He further was not required to exercise professional judgment when driving Brandon across the lake. *See Davis*, 193 S.W.3d at 763 ("Police officers, driving in non-emergency situations, do not benefit from official immunity."). Therefore, applying official immunity to such decisions would permit officers to engage in highly dangerous conduct for no exigent purpose.

Piercy argues that Plaintiffs must allege he violated a statutory or departmentally-mandated duty. However, as the Missouri Court of Appeals noted in *Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725 (Mo. Ct. App. 2011), "Missouri cases have routinely denied official immunity in instances where no statute or state regulation was violated" because a ministerial act can also derive from "the nature of the position for which the defendant was employed." *Id.* at 730 (citing cases). As an example, the *Nguyen* court noted that "[o]bviously, a janitor employed by the government that defies department rules and/or his supervisor's orders could not be reasonably deemed to be entitled to official immunity when he decides not to post a "wet floor" sign after mopping." *Id.*

Brandon's case is analogous. By the nature of Piercy's position, he is required to ensure a minimum level of safety for persons held within his custody. Just as a "janitor's duty to post such a sign could not be deemed to require the exercise of reason in the adaptation of means to an end," *id.*, so too does Piercy carry a baseline ministerial obligation to safely restrain the persons within his care.

Plaintiffs can maintain their negligence claim stated against Piercy in his personal capacity.

### E.  Counts VI, VII; Negligence Hiring, Training, and Supervision

Several defendants further move for dismissal of the negligent hiring, training, and supervision claims asserted against them. Defendants Replogle, Johnson, Kindle, and Clardy seek their dismissal from Count VI. Defendant Replogle seeks dismissal from Count VII.

Plaintiffs have not contested any of these arguments. Accordingly, these claims are dismissed with prejudice.

### F.  Count IX; Conspiracy to Commit Abuse of Process

Finally, Piercy argues he should be dismissed from Count IX because Missouri does not recognize a tort of civil conspiracy. Plaintiffs have not contested this argument. Accordingly, because Piercy was the only defendant still pending under Plaintiffs' Count IX claim, Count IX is dismissed with prejudice.

### III.    Conclusion

For the foregoing reasons, Defendants Replogle, Johnson, Kindle, Clardy, Stacks, Missouri State Highway Patrol, and State of Missouri's Motion for Partial Judgment on the Pleadings [Doc. 134] is granted in part and denied in part, as follows:

- Defendants' motion to dismiss Plaintiff Jennifer Ellingson's claims, as asserted against these defendants under Counts II, III, VI, VII, and VIII, is denied as moot.
- Count II is dismissed to the extent it alleges Fifth Amendment violations against Defendants Replogle, Johnson, Kindle, and Clardy. Plaintiffs' individual claims against Replogle, Johnson, Kindle, and Clardy premised on a Fourteenth Amendment violation are also dismissed. However, Defendants' motion to dismiss Plaintiffs' Fourth Amendment claim is denied.
- Defendants Kindle, Clardy, and Stacks are dismissed from Count III with regards to the civil conspiracy claims alleged under Section 1985 and Section 1986.
- Plaintiffs' claims under Count VI are dismissed as to Defendants Replogle, Johnson, Kindle, and Clardy. Plaintiffs' claims under Count VII are dismissed as to Defendant Replogle.

Defendant Piercy's Motion for Partial Judgment on the Pleadings [Doc. 158] is granted in part and denied in part, as follows:

- Plaintiff Jennifer Ellingson's claims under Count I are dismissed. Count I is further dismissed to the extent it alleges Fifth Amendment violations against Defendant Piercy. Plaintiffs' individual claims against Piercy premised on a Fourteenth Amendment violation are also dismissed. However, Defendant Piercy's motion to dismiss Plaintiffs' Fourth Amendment claim and Fourteenth Amendment estate claim is denied.

35

- Defendant Piercy is dismissed from Count III with regards to the civil conspiracy claims alleged under Section 1985 and Section 1986. However, Piercy's motion to dismiss Plaintiffs' civil conspiracy claim under Section 1983 is denied.

- Defendant Piercy's motion for partial dismissal of Count IV is denied.

- Defendant Piercy's motion to dismiss Count IX is granted.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 10, 2016
Jefferson City, Missouri