# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| CRAIG E. ELLINGSON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:14-cv-04316-NKL |
| | ) |
| ANTHONY C. PIERCY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

Before the Court is third party Amanda Grellner's Motion to Quash Subpoena [Doc. 173]. For the following reasons, the motion is granted in part and denied in part.

## I.  Background

Plaintiffs, the surviving parents and sibling of Brandon Ellingson, brought suit against Defendants for their roles in Brandon's death, which occurred while he was in the custody of Defendant Anthony Piercy, a Missouri State Trooper. In their conspiracy claims, Plaintiffs alleged that several defendants attempted to shield Piercy from liability by suppressing facts during their investigation of Brandon's death and during the coroner's inquest.

Amanda Grellner, who is not a defendant, was a Morgan County special prosecutor for purposes of deciding whether to bring criminal charges stemming from Brandon's death. Grellner, an attorney, held this position from August 2014 until March

1

2015, when she recused herself due to a conflict of interest. During the interim period, in September 2014, Grellner participated in the coroner's inquest, which was held to determine the cause of death pursuant to Mo. Rev. Stat. § 58.260. Grellner helped Morgan County Coroner Dr. M.B. Jones prepare for the inquest. Dr. Jones was a party to this case until June 15, 2015, when the Court dismissed all claims against him. *See* [Doc. 95].

## II. Discussion

Grellner has filed a Motion to Quash in response to a subpoena served upon her by Plaintiffs. The subpoena requests Grellner's appearance at a deposition, to which she is requested to bring "[a]ll docouments in [her] possession relating to: the drowning of Brandon Ellingson . . .; [her] investigation into the Incident; [and her] preparation for the inquest convened on September 4, 2014, including notes and questionnaires [she] prepared regarding any possible witnesses or exhibits, and all email communications re[garding] [her] investigation or preparation for the inquest." [Doc. 173-1, p. 1].

In her motion, Grellner objects to production of the following documents:

> 1. Email from Ms. Grellner to Morgan County Coroner Dr. M.B. Jones dated 9/3/14 re: hearing strategy (e.g., exhibits, questions of witnesses).
> 2. Email from Ms. Grellner to Dr. Jones dated 9/1/14 re: hearing strategy (e.g., witness preparation, exhibits).
> 3. Missouri State Highway Patrol Report
> 4. Email correspondence to/from Ms. Grellner to/from Mr. Larry Moreau about what he witnessed, and any attachments thereto.
> 5. Exhibit List prepared by Ms. Grellner for Coroner's Inquest
> 6. Outlines prepared by Ms. Grellner for witnesses at Coroner's Inquest.

[Doc. 173, pp. 3-4].

Grellner further asks the Court to modify her subpoena to prohibit any inquiries at her deposition that involve (1) questions seeking disclosure of content covered by attorney-client privilege or work product privilege; (2) questions about the mental impressions and legal conclusions formed by Grellner while preparing for the inquest and while deciding whether to bring charges against Piercy; and (3) questions regarding any active criminal investigation.

Under Federal Rule of Civil Procedure 45, a party may subpoena a non-party in order to obtain discoverable materials. *See* 1991 Amendment Notes to Fed.R.Civ.P. 45. However, a court "must quash or modify a subpoena that . . . requires disclosure of privileged or other protected information." Fed.R.Civ.P. 45(c)(3)(A)(iii).

### A. Attorney-Client Privilege

Grellner first argues that her emails with Dr. Jones are protected under the attorney-client privilege because Dr. Jones, a non-attorney, served as her client while preparing for the inquest. The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn v. United States*, 449 U.S. 383, 389 (1981). Accordingly, the "privilege protects confidential communications between a client and his attorney made for the purpose of facilitating the rendering of legal services to the client." *United States v. Beckman*, 787 F.3d 466, 481 (8th Cir. 2015).

Plaintiffs argue that Grellner's emails with Dr. Jones do not meet this standard. First, Plaintiffs maintain that Grellner's client was not Dr. Jones, but rather the people of Morgan County. Citing Missouri law, Plaintiffs state that the statutes discussing coroners do not mention a relationship between the coroner and the prosecuting attorney. *See* Mo. Rev. Stat. §§ 58.260, 58.375, 58.451. A special prosecutor, moreover, cannot represent "a party other than the state of Missouri in any criminal case or proceeding . . . for the duration of that appointment." Mo. Rev. Stat. § 56.110. Missouri law also provides that "[t]he prosecuting attorney shall represent generally the county in all matters of law." Mo. Rev. Stat. § 56.070(1). Based on this statutory analysis, Plaintiffs argue that Grellner could not serve as Dr. Jones' attorney, and thus no attorney-client privilege existed. *See Diversified Indus. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977) ("In order for the privilege to be applicable, the parties to the communication in question must bear the relationship of attorney and client.").

The existence of an attorney-client relationship is determined by state law. *United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013). In Missouri, "an attorney-client relationship is sufficiently established when the advice and assistance of attorney is sought and received in matters pertinent to her profession." *State v. Longo*, 789 S.W.2d 812, 815 (Mo. Ct. App. 1990). Courts applying this standard ask whether the parties, objectively, engaged in a professional relationship concerning legal matters. *See State v. Smith*, 979 S.W.2d 215, 220 (Mo. Ct. App. 1998). They also ask whether the client subjectively believed such a relationship to exist. *See Longo*, 789 S.W.2d at 815; *State v. Barber*, 391 S.W.3d 2, 6 (Mo. Ct. App. 2012).

Considering the context of Grellner and Dr. Jones' relationship, the Court finds that regardless of Grellner's statutory duties, she was engaged in a professional relationship with Dr. Jones that concerned legal matters. Even in absence of "positive law expressly authoriz[ing] the prosecutor to assist the coroner or to conduct the inquest," the Eighth Circuit has found "it is understandable that a non-lawyer coroner would desire the assistance of an attorney in conducting the inquest" because "the coroner's inquest is in effect a quasi-judicial proceeding." *Williams v. Hartje*, 827 F.2d 1203, 1209 (8th Cir. 1987). As such, in *Williams*, "the prosecutor followed long-established local law-enforcement custom in sharing the coroner's responsibility in order to provide the legal expertise lacked by an elected non-lawyer coroner. His role, although not required by statute, is not inconsistent with any of his statutory duties." *Id*. Grellner likewise helped Dr. Jones prepare for Brandon's inquest and did not violate her statutory duties in doing so.

Nevertheless, during a teleconference held before the Court, Plaintiffs contended that "assistance" is different from representation, and thus Grellner was not necessarily providing Dr. Jones legal advice when she assisted his inquest preparation. The Court does not find this distinction significant. Articulations of the attorney-client privilege often use the word "assistance" in place of the word "advice" without suggesting a meaningful variation between the two. *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 68 (2000) ("[T]he attorney-client privilege may be invoked . . . with respect to: (1) a communication; (2) made between privileged persons; (3) in confidence; (4) for the purpose of obtaining or providing legal *assistance* for the client.")

5

(emphasis added). Further, the Eighth Circuit has found that an attorney is not rendering legal services when he acts as a "courier," "conduit," or "scrivener" for the client. *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984) (citing cases). Grellner's role in the inquest far exceeded this level of support. As both parties maintained during the teleconference, Grellner's communications with Dr. Jones included strategy emails sent in anticipation of the inquest, a quasi-judicial proceeding. Grellner rendered a legal service in providing these strategies.

Therefore, for purposes of the attorney-client privilege, Dr. Jones was a client of Grellner's during the inquest preparation. The term "client" is broadly defined in this context: it includes any "person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer." *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir. 1994) (*quoting* Supreme Court Standard 503(a)(1)). At the time of their communications, both Grellner and Dr. Jones were working for Morgan County, a public entity. While Grellner was tasked with representing the people of Morgan County, Dr. Jones was also working on behalf of Morgan County. Grellner and Dr. Jones' communications are therefore akin to communications between employees of a corporation and the corporation's counsel. *See Williams v. Herron*, 2011 WL 555127, at *6 (D. Neb. Feb. 8, 2011) (finding that a county counsel's interview of county employees was protected by attorney-client privilege) (*citing In re Bieter Co.*, 16 F.3d at 938; *Upjohn*, 449 U.S. at 401).

Plaintiffs argue that under this conclusion, "all county officials are represented at all times by the prosecuting attorney for that county whether elected or specially

appointed," which "means that no elected or appointed prosecuting attorney can investigate a county employee for illegal acts committed in office or under color of law, as this would be a clear conflict of interest." [Doc. 192, p. 4]. But Grellner has not claimed, and the Court does not find, that she represented Dr. Jones at all times. Rather, Grellner merely represented Dr. Jones for the narrow purpose of assisting in his preparation for the inquest. The problem identified by Plaintiffs is routinely resolved by appointing a special prosecutor if an actual conflict of interest is found.

Plaintiffs further rely on *Sampson v. Schenck*, 2009 WL 484224 (D. Neb. Feb. 23, 2009) and *Doubleday v. Ruh*, 149 F.R.D. 601 (E.D. Cal. 1993), but those cases are not binding on the Court. They also are distinguishable. In *Sampson*, the defendants contended that an attorney-client privilege existed between law enforcement investigators and a county attorney. The District of Nebraska rejected this argument because the "investigators cannot be considered clients of the [county attorney] under the circumstances present." *Sampson*, 2009 WL 484224 at *8. Those circumstances included, notably, the court's conclusion that the county attorney was not providing legal advice and that the communications at issue were not confidential. As discussed above, conversely, Grellner was providing legal advice to Dr. Jones. Plaintiffs further do not dispute whether Grellner's emails were confidential.

In *Doubleday*, a county asserted the work product privilege on documents that had been prepared for a prior litigation. Because documents created for a prior litigation must be prepared by, or on behalf of, a party involved in the subsequent litigation, the *Doubleday* court asked whether the plaintiff in the prior case—"the People of the State of

7

California"—was synonymous with the county asserting the work product privilege. The court found these entities were not synonymous because cases prosecuted on behalf of "the People" can be brought by the attorney general's office, as well. *Doubleday*, 149 F.R.D. at 606. In the present situation, the question is not whether Grellner and Dr. Jones are synonymous parties for purposes of a subsequent litigation. Instead, the dispositive question is merely whether Grellner was acting in a representative capacity when she emailed Dr. Jones.

Therefore, to the extent these emails discuss strategy regarding the coroner's inquest, they are protected by attorney-client privilege. However, merely attaching documents to an email sent to a client does not mean those documents are covered by the attorney-client privilege for all purposes. While Plaintiffs cannot simply ask for materials that are attached to a privileged email, the fact that materials are attached to a privileged email does not protect them from discovery requested in a different context.

### B. Work Product Privilege

Grellner next argues that the materials she prepared in advance of the coroner's inquest—including items not covered by the attorney-client privilege—are protected instead by work product privilege. An attorney's work product comprises "documents and tangible things that are prepared in anticipation of litigation." Fed.R.Civ.P. 26(b)(3). *See also Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (applying the work product privilege to prosecutors). This includes both "raw factual information," *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000), and an attorney's opinion work product—her "conclusions, mental impressions, opinions,

and legal theories concerning the litigation," *Gundacker v. Unisys Corp.*, 151 F.3d 842, 849 (8th Cir. 1998).

### 1. Emails Sent Between Grellner and Larry Moreau

The emails sent between Grellner and Moreau are covered by the work product doctrine. As discussed above, the coroner's inquest was a quasi-judicial proceeding. It follows that materials assembled and prepared in advance of an inquest, as with those prepared in advance of other quasi-judicial proceedings, are subject to the work product privilege. *See In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840, 845 (8th Cir. 1973) (work product privilege applies in grand jury proceedings, which are quasi-judicial in nature).

Accordingly, because emails sent from Moreau to Grellner presumably contain raw factual information assembled by Grellner in advance of the inquest, they are properly considered ordinary work product. *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Emails sent from Grellner to Moreau, meanwhile, presumably reflect her thoughts and impressions, and so they likely constitute opinion work product.[1]

Plaintiffs do not appear to argue otherwise. They offer two grounds, however, for these emails being discoverable nevertheless. First, Plaintiffs contend that emails sent between Grellner and Moreau, a non-party witness to Brandon's death, cannot be protected as work product because Grellner has already produced them to an outside party. While producing documents to a third party renders a party's claim of

---

[1] It appears that Plaintiffs already have these emails. *See* [Doc. 192, p. 5] (stating that Plaintiffs intend to attach the Moreau emails as sealed exhibits). The Court gave them permission to file the emails under seal, *see* [Doc. 201], but Plaintiffs have not done so.

confidentiality less credible, *United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040, 1045 (8th Cir. 1992), "[c]ourts generally agree that, because the work product privilege looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, it is not automatically waived by the disclosure to a third party." *United States v. Johnson*, 378 F. Supp. 2d 1041, 1047 (N.D. Iowa 2005) (citing cases) (internal quotation marks omitted). Therefore, in these cases, courts ask whether the disclosure "substantially increase[s] the opportunities for potential adversaries to obtain the information." *E.E.O.C. v. Woodmen of the World Life Ins. Soc'y*, 2007 WL 1544772, at *3 (D. Neb. Mar. 23, 2007) (*quoting* 8 Wright, et al., Federal Practice & Procedure, Civ.2d § 2024 (1994)). Plaintiffs have not provided any evidence that Grellner's disclosure to Moreau substantially increased the likelihood for potential adversaries to obtain this information.

Plaintiffs alternatively argue that "[t]hese emails reveal Grellner had either ignored or been ignorant of evidence showing Piercy's culpability for Brandon's death," and therefore they "further[] Plaintiffs' claims of an effort to cover-up the scope of Piercy's involvement." [Doc. 192, p. 4]. Grellner did not present key evidence at the coroner's inquest, Plaintiffs maintain, and so "Plaintiffs have the right to know whether this was due simply to abysmal litigation work or intentional influence by the MSHP." *Id.* at 11.

In making this argument, Plaintiffs assert they have demonstrated "compelling need" to examine documents, such as the Moreau emails, prepared by Grellner before the inquest. The Eighth Circuit has stated that ordinary work product "is not discoverable unless the party seeking discovery has a substantial need for the materials and cannot

obtain the substantial equivalent through other means." *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP*, 305 F.3d 813, 817 (8th Cir. 2002) (*citing* Fed.R.Civ.P. 26(b)(3)). Opinion work product, meanwhile, requires a "far stronger showing of necessity and unavailability." *Upjohn*, 449 U.S. at 402. It "enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud." *Baker*, 209 F.3d at 1054.

Plaintiffs have shown substantial need to discover the emails sent from Moreau to Grellner. According to Plaintiffs, Grellner decided not to bring charges against Piercy due to influence exerted by the MSHP. To prove this theory at trial, Plaintiffs will need to show causation; specifically, they will need to show that Grellner was aware of material evidence she did not present at the inquest, or alternatively that the MSHP intentionally withheld such information from her. Either way, Plaintiffs cannot ascertain what information Grellner knew without discovering the relevant emails she received.

However, Plaintiffs have not demonstrated a substantial need for the emails sent from Grellner to Moreau. While these emails may show, as Plaintiffs suggest, Grellner's participation in the alleged cover-up, Grellner is entitled absolute immunity for her actions and Plaintiffs have not explained why they cannot obtain the emails through other means. Unlike the emails Moreau wrote to Grellner, Plaintiffs do not need to discover Grellner's emails in order to determine whether she received them and, therefore, whether she was aware of them. Rather, the emails written by Grellner are relevant to Plaintiffs only for the content they contain. The Court does not see—and crucially,

Plaintiffs have not shown—why they cannot obtain this content directly from Moreau. *See Am. Standard Inc. v. Bendix Corp.*, 80 F.R.D. 706, 709 (W.D. Mo. 1978) (finding a "rare situation" where the attorney's mental impressions could be discovered, but only because the attorney was a key witness to the underlying fraud and the information was not ascertainable through other means).

As such, Plaintiffs may discover emails sent from Moreau to Grellner. Emails sent from Grellner to Moreau, however, are not discoverable.

### 2. Exhibit List and Outlines Prepared by Grellner for the Coroner's Inquest

The exhibit list and outlines prepared by Grellner in advance of the inquest also fall within the ambit of the work product doctrine. Further, because these documents reflect the opinions and legal impressions Grellner held while planning for the inquest, the Court will consider them opinion work product.

Nevertheless, Plaintiffs argue that the exhibit list and outlines are discoverable. First, Plaintiffs argue that Dr. Jones has "produced the Witness and Exhibit List he utilized at the Inquest," and so Grellner can no longer assert privilege over this document. [Doc. 192, p. 4]. Second, as discussed above, Plaintiffs more generally claim that Grellner's work product is discoverable because they have shown a substantial need for the information.

The Court does not find these arguments persuasive. To the extent the exhibit list and outlines have already been produced to Plaintiffs in discovery, Plaintiffs have not shown substantial need for these documents to be produced again. Alternatively, to the

extent Plaintiffs are attempting to discover additional lists and outlines that were not used at the inquest, *see* [Doc. 192, p. 4] (seeking to discover "any deviation" from the lists Grellner prepared), they have not shown a substantial need for this information. Even if some changes may have occurred between a first and final draft, this evidence constitutes such a weak inference of fraud that the Court is not persuaded that an exception to the work product protection is justified.

### C. The MSHP Report

Grellner also argues she is protected from providing the Missouri State Highway Patrol Report. The MSHP Report was not produced by Grellner, however, so she cannot assert that it is covered by the work product doctrine. *See United States v. Nobles*, 422 U.S. 225, 237-38 (1975) (work product must be produced by the attorney or her agent).

Consequently, Grellner does not hold any privilege to protect this document from disclosure. Grellner argues that the MSHP Report is a closed record under Mo. Rev. Stat. § 610.100.2, which provides that "investigative reports of all law enforcement agencies are closed records until the investigation becomes inactive." Yet the MSHP Report has already been provided to Plaintiffs in this litigation. Therefore, considering that the report has been disclosed, its contents are known to Plaintiffs, and Grellner holds no privilege to shield it, the Court finds that Section 610.100.2 affords Grellner no protection from Plaintiffs' subpoena.

### D. Deposition Questions

Finally, Grellner asks the Court to prevent Plaintiffs from pursuing three lines of questioning at her deposition: (1) questions seeking disclosure of content covered by

13

attorney-client privilege or work product privilege; (2) questions about the mental impressions and legal conclusions formed by Grellner while preparing for the inquest and while deciding whether to bring charges against Piercy; and (3) questions more generally regarding any active criminal investigation.

### 1. Questions About Privileged Content

For the reasons examined above, Plaintiffs cannot ask questions regarding the content of any communication protected by attorney-client privilege or document protected by work product privilege.

### 2. Questions About Mental Impressions

Grellner's intangible mental impressions are also covered by the work product privilege. *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 513 (D. Minn. 1997) (*citing Shelton v. American Motors Corp.*, 805 F.2d 1323, 1326 (8th Cir. 1986)) (when a party seeks to discover an attorney's mental impressions, the work product privilege extends to cover intangible interests). Therefore, as discussed above, Plaintiffs cannot discover Grellner's mental impressions unless they show "a substantial need for the materials," *PepsiCo,* 305 F.3d at 817, under a "very rare and extraordinary circumstance[], such as when the material demonstrates that an attorney engaged in illegal conduct or fraud," *Baker*, 209 F.3d at 1054.

Plaintiffs again argue that Grellner's mental impressions are discoverable because she was "intentional[ly] influence[d] by the MSHP," [Doc. 177, p. 11], and participated in the "intentional[] sabatoge[]" it conducted following Brandon's death, *id.* at 9.

Plaintiffs thus maintain that Grellner's "actions in shielding Piercy from criminal prosecution should not be protected from investigation." *Id.* at 10.

Having examined Plaintiffs' argument, the Court concludes that Grellner can be questioned about information, evidence, and suggestions that she received during her investigation and who provided that information, evidence, or suggestion. This is ordinary work product and as a practical matter, impossible to find from some other source. However, Grellner's mental impressions are not discoverable so long as she will not testify at trial concerning her mental impressions, including her decision to not prosecute Defendant Piercy. Special immunity provided to prosecutors, as well the very high bar for work opinion evidence, does not justify an exception under these circumstances. However, it would be unfair to permit Grellner to discuss her mental impressions at trial while precluding Plaintiffs from gathering this information through discovery.

### 3. Questions About the Criminal Investigation

Finally, relying on Mo. Rev. Stat. § 610.100, Grellner argues that Plaintiffs cannot ask her questions about any active criminal investigation. As stated above, Section 610.100 provides that "investigative reports of all law enforcement agencies are closed records until the investigation becomes inactive." Mo. Rev. Stat. § 610.100.2. An investigative report, in turn, is "a record . . . prepared by personnel of a law enforcement agency." Mo. Rev. Stat. § 610.100.1(5).

By its language, this statute protects closed investigative reports—and presumably, their content as well—from disclosure during a deposition. Yet under even

15

the broadest reading, however, the statute covers only "reports"—not all conceivable questions about an ongoing investigation. *See State ex rel. Thurman v. Franklin*, 810 S.W.2d 694, 699 (Mo. Ct. App. 1991) (Chapter 610 does not create a privilege that prevents inquiries into an individual's personal knowledge at a deposition). Therefore, to the extent Plaintiffs plan to ask about the content of a closed investigative report prepared by law enforcement personnel, this line of inquiry is foreclosed by the statute. Otherwise, Section 610.100 does not offer Grellner any added protection at her deposition.

### III. Conclusion

For the foregoing reasons, third party Amanda Grellner's Motion to Quash Subpoena [Doc. 173] is granted in part and denied in part, as follows:

- Emails sent between Grellner and Dr. Jones, which discuss strategies in advance of the coroner's inquest, are protected by attorney-client privilege. Documents attached to these emails are not necessarily protected.
- Emails sent between Grellner and Larry Moreau constitute work product. However, Plaintiffs can discover emails sent from Moreau to Grellner. Plaintiffs cannot discover emails sent from Grellner to Moreau.
- The exhibit lists and outlines prepared by Grellner for the coroner's inquest are work product and protected by work product privilege.
- Grellner holds no privilege or protection over the Missouri State Highway Patrol Report.
- At her deposition, Plaintiffs cannot ask Grellner about the content of any communication protected by attorney-client privilege or document protected by work product privilege. Plaintiffs also cannot inquire into

mental impressions held by Grellner, provided she will not testify at trial regarding those mental impressions. However, Plaintiffs can ask about information, evidence, and suggestions that Grellner received during her investigation and who provided that information, evidence, or suggestion. Plaintiffs finally cannot ask about the content of a closed investigative report prepared by law enforcement personnel, provided this report pertains to an active investigation, but Grellner is not protected from answering other questions about an investigation.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: June 16, 2016  
Jefferson City, Missouri