**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| CRAIG E. ELLINGSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-04316-NKL |
| | ) | |
| ANTHONY C. PIERCY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court are the Defendants' motions for summary judgment. [Docs. 228, 230, 233, 235]. In these motions, the Defendants move for summary judgment on the following counts: Defendant Piercy on Counts I and III; Defendants Replogle, Johnson, Kindle, Clardy, Stacks, Missouri State Highway Patrol, and State of Missouri on Counts II and III; Defendants Barbour, Echternacht, and McCullough on Counts II, III, and VI; and Defendants Eberhard, Herndon, Harris, and Fick on Counts III and VII.

In light of the Court's order granting a bifurcated briefing schedule on Count III, *see* [Doc. 265], the Court will address only Plaintiffs' non-conspiracy counts in this order. Of these counts, the Court grants Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour summary judgment on Count II. Defendants Barbour, Echternacht, and McCullough are also granted summary judgment on Count VI.

1

Defendants Eberhard and Herndon are granted summary judgment on Count VII. However, Defendant Piercy's motion for summary judgment on Count I is denied.

## I.   Background

Plaintiffs Craig, Sherry, and Jennifer Ellingson, the surviving parents and sibling of Brandon Ellingson, brought suit against the Defendants, all state or county employees, for violations of federal and state law while Brandon was in custody and during the subsequent investigation into his death.

### A.  Undisputed Facts

The following facts are uncontroverted for purposes of this order.

In May 2014, Defendant Anthony Piercy served as a trooper in the Missouri Highway Patrol. [Doc. 231-1, p. 11]. On May 31, at around 5:00 p.m., Piercy was patrolling Lake of the Ozarks when he stopped a boat operated by Brandon Ellingson on suspicions of boating while intoxicated. [Doc. 231-1, p. 12]. Brandon came onto Piercy's patrol boat, where Piercy conducted at least one sobriety test and placed Brandon under arrest. *Id*. Piercy handcuffed Brandon behind his back. [Doc. 275-32, p. 10]. Piercy then placed a Type III personal flotation device on Brandon, even though there was also a Type I device on the boat. [Doc. 275-31, p. 7]. Piercy applied the Type III device by fitting it around Brandon's body without putting Brandon's arms through the armholes or securing the device's crotch strap. [Doc. 275-21, pp. 4-5]. Finally, Piercy placed Brandon "leaning against a flipped up seat" on the patrol boat and began

driving across the water. [Doc. 275-31, p. 14]. Brandon was cooperative throughout this process. [Doc. 231-1, p. 17].

Two Missouri State Highway Patrol policies discuss the use of personal flotation devices when transporting prisoners. MSHP Special Order No. 8 provides that a "Coast Guard approved personal flotation device will be placed on any prisoner transported in patrol watercraft." [Doc. 231-6, p. 1]. MSHP General Order 48-3 directs officers that a suspect "should be search for weapons, handcuffed, secured in a U.S. Coast Guard approved Type I or Type II personal flotation device, and placed in a Patrol vessel." [Doc. 231-8, p. 1].

After placing Brandon in the boat, Piercy proceeded to drive across Lake of the Ozarks, intending to transport Brandon to an MSHP satellite office. [Doc. 275-32, p. 13]. During this drive, Piercy's patrol boat hit speeds that reached, at one point, around 40 miles per hour. [Doc. 274-1, p. 2]. Minutes afterwards, Brandon exited the boat and entered the lake. [Doc. 275-3, p. 4]. Brandon's personal flotation device separated from his body while he was in the water. [Doc. 275-31, p. 16]. Piercy attempted to rescue Brandon, but this attempt was unsuccessful and Brandon drowned. [Doc. 231-2, pp. 4-6].

At the time of Brandon's death, Piercy was a cross-trained road officer who had received marine enforcement training. In the summer of 2012, Piercy attended a three-day familiarization program during which he rode with veteran officers and observed water enforcement activities, including BWI arrests. [Doc. 231-9]. In October 2012, Piercy attended Basic Boat school, and the following year, in March 2013, he participated in a 4-week Marine Enforcement Training course. *Id*. This course covered subjects

3

including survival swimming, boat stop and approach training, and tactical water survival. *Id.* After completing the course, Piercy began working shifts in April 2013 with veteran marine officers on Lake of the Ozarks. *Id.*

Sergeant Randy Henry, who is not a party to this suit, recommended on June 2, 2013 that Piercy be allowed to operate a boat by himself. [Doc. 231-14, p. 1]. Defendant Clardy then approved Piercy for solo enforcement duties on the day of Brandon's drowning. [275-7, p. 8]. Prior to Brandon's death, no defendant had notice of any previous failure by Piercy to properly secure an arrestee during transport. [Docs. 231-11, p. 1; 231-16, p. 1; 231-17, p. 1; 275-7, p. 8; 231-1, p. 2; 234-5, p. 1; 234-6, p. 1].

### B. Procedural History

Plaintiffs filed this suit on December 5, 2014. The following claims are still pending:

- Count I: Fourth and Fourteenth Amendment Violations under 42 U.S.C. § 1983. Asserted by Plaintiffs Craig and Sherry (as co-administrators of Brandon's estate) against Trooper Piercy (individually).
- Count II: Fourth and Fourteenth Amendment Violations under 42 U.S.C. § 1983. Asserted by Plaintiffs Craig and Sherry (as co-administrators of Brandon's estate) against Colonel Replogle, Major Johnson, Captain Kindle, and Lieutenant Clardy (individually). Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually). Fifth Amendment Violation under 42 U.S.C. § 1983; asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (individually).

4

- Count III: Civil Conspiracy under 42 U.S.C. § 1983. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Captain Kindle, Lieutenant Clardy, and Corporal Stacks (individually). Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy, Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Trooper Fick, Captain Eberhard, and Lieutenant Herndon (individually). Civil Conspiracy under 42 U.S.C. §§ 1985 and 1986; asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Lieutenant McCullough, Corporal Echternacht, Sergeant Barbour, Sergeant Harris, Trooper Fick, Captain Eberhard, and Lieutenant Herndon (individually).

- Count IV: Negligence. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually and in his official capacity).

- Count V: Negligence Per Se. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) and Jennifer against Trooper Piercy (individually and in his official capacity).

- Count VI: Negligent Hiring, Training, and Supervision (of Trooper Piercy) under Mo. Rev. Stat. § 537.080. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Lieutenant McCullough, Corporal Echternacht, and Sergeant Barbour (in their official capacities).

- Count VII: Negligent Hiring, Training, and Supervision (of Corporal Stacks and Sergeant Harris) under Mo. Rev. Stat. § 537.080. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against Captain Eberhard and Lieutenant Herndon (in their official capacities).

5

- Count VIII: Respondeat Superior under Mo. Rev. Stat. § 537.080. Asserted by Plaintiffs Craig and Sherry (individually and as co-administrators of Brandon's estate) against the State of Missouri and the MSHP.

## II.    Discussion

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matshushita Elec. Indus. v. Zenith Radio Corp*., 475 U.S. 5734, 587 (1986). Therefore, to obtain summary judgment, a moving party must argue that "there is no genuine dispute as to any material fact" by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56.

If the movant satisfies this burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial" by similarly citing to particular materials in the record. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where the material facts are uncontroverted, a court "shall grant summary judgment if . . . the movant is entitled to judgment as a matter of law." *Wolfe Auto. Grp., LLC v. Universal Underwriters Ins. Co.*, 808 F.3d 729, 732 (8th Cir. 2015) (*quoting* Fed.R.Civ.P. 56(a)).

### A. Count I; Civil Rights Violations Against Defendant Piercy

6

Arguing he cannot be held liable under the Fourth or Fourteenth Amendment for his reasonable mistakes made in grey areas of the law, Piercy contends he is entitled qualified immunity on Plaintiffs' civil rights claims. Qualified immunity protects government officials from suit unless their conduct violated a clearly established right of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When considering a qualified immunity claim, courts will conduct a two-step inquiry: "[i]n one step, the deciding court determines whether the facts demonstrate a deprivation of a constitutional right. In the other, the court determines whether the implicated right was clearly established at the time of the deprivation." *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (internal citations omitted).

## 1. Fourth Amendment

Piercy deprived Brandon of a constitutional right under the Fourth Amendment if his actions were not "objectively reasonable" as "judged from the perspective of a reasonable officer on the scene." *Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011). Piercy admits he committed errors during Brandon's arrest, but maintains that these errors were not objectionably unreasonable such that they rise to the level of a constitutional violation. He further maintains, in any event, that existing precedent was not "beyond debate" in May 2014, and so a reasonable officer in his position would not have known he was violating the law. *City & Cnty. of S.F., Calif. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015); *see also Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014).

The Court has already addressed this issue in its prior order.  *See* [Doc. 241].  In denying Piercy's motion for judgment on the pleadings on Plaintiffs' Fourth Amendment claim, the Court wrote:

> Taking into account the circumstances of Brandon's case, the Court cannot say that Piercy seized Brandon in an objectively reasonable manner. At the time of his seizure, Brandon did not pose an immediate threat to Piercy or to the safety of any third party.  He was not suspected of a violent crime, but rather of a misdemeanor, and he was not attempting to evade arrest.  *See Brown v. City of Golden Valley*, 574 F.3d 491, 496-97 (8th Cir. 2009) (a seizure is less objectively reasonable where the suspected crime was a misdemeanor and the suspect was not posing a safety threat or attempting to flee).  Simply put, nothing about Brandon and Piercy's interaction suggested a "tense, uncertain, and rapidly evolving" situation. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

> Despite these controlled circumstances, however, a jury could find Piercy made a series of decisions during Brandon's seizure that, taken together, fell far outside the scope of reasonable officer conduct.  Plaintiffs allege that after handcuffing Brandon behind his back—a measure that prevented Brandon from swimming or holding onto the patrol boat—Piercy improperly secured Brandon in a life vest that would not support him in water and, moments afterwards, positioned Brandon against a flipped-up seat that would not stabilize him during transit.  Piercy then exacerbated the consequences of these choices by driving across the lake at a high rate of speed—a decision wholly unreasonable in light of his other actions.

[Doc. 241, p. 10].

The Court proceeded to deny Piercy qualified immunity on this claim:

8

Having considered the precedent behind Plaintiffs' Fourth Amendment allegations, the Court finds it "beyond debate" that the erratic operation of a police vehicle—whether a car or a boat—can constitute an objectively unreasonable seizure. Eighth Circuit precedent has established that the manner in which an offer operates his vehicle may cause a Fourth Amendment violation. *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011). *See also Brown v. Missouri Dep't of Corr.*, 353 F.3d 1038, 1040 (8th Cir. 2004) (plaintiff alleged a constitutional violation where the officer drove erratically after failing to secure him properly). While the Eighth Circuit has not discussed Fourth Amendment seizures in the context of a water transport, Plaintiffs allege that Piercy drove at speeds exceeding 40 miles per hour across a crowded lake in a non-emergency situation. Such driving would bring Piercy's actions in line with those found unreasonable in *Chambers*: in both cases, a restrained suspect was subject to erratic driving, causing him physical injury. *See Chambers*, 641 F.3d at 908.

Further, the Eighth Circuit has clearly-established that actions causing injury to a restrained, subdued suspect are unreasonable when the circumstances of the case offer no countervailing justification for the officer's decisions. *See Brown*, 574 F.3d at 496-97. This is especially true where the injury suffered is significant. *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003). In such situations, Eighth Circuit precedent has also established that the manner in which an individual is restrained may give rise to a Fourth Amendment violation. *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002); *Littrell v. Franklin*, 388 F.3d 578, 586 (8th Cir. 2004) (*citing Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) (finding that the manner of restraint may be unreasonable under the circumstances)).

[Doc. 241, pp. 14-15].

Case 2:14-cv-04316-NKL   Document 292   Filed 06/29/16   Page 9 of 26

The Court's analysis of Plaintiffs' Fourth Amendment claim remains unchanged at the summary judgment stage. Piercy admits that he handcuffed Brandon with his hands behind his back; placed a Type III lifejacket on Brandon, leaving the crotch strap unsecured and Brandon's arms without access to the armholes; and then leaned Brandon against a flipped-up seat in the patrol boat. Piercy further has not controverted Plaintiffs' evidence showing that the patrol boat hit speeds around 40 miles per hour in the moments before the accident. Taken together, these facts still reveal objectively unreasonable actions taken by Piercy while arresting and transporting Brandon.[1] The Court cannot say they merely reflect "bad guesses in gray areas," as Piercy claims. [Doc. 229, p. 18].

Nevertheless, Piercy argues that the above facts do not sufficiently correspond to those in *Chambers*, and therefore he was not on notice that his conduct violated clearly-established constitutional law. Piercy points out that *Chambers* occurred on the road, not in the water; that *Chambers* involved allegations of gratuitous force imparted for the intended purpose of displacing the arrestee within the vehicle; and that *Chambers* says nothing about how an officer handcuffs a detainee or conducts a water rescue. The Court does not find these distinctions notable. First, in *Chambers*, the Eighth Circuit found that the plaintiff had properly alleged a Fourth Amendment violation where the officer "was driving . . . erratically." *Chambers*, 641 F.3d at 905. In doing so, the Eighth Circuit established that a plaintiff may be deprived of his constitutional rights when he is placed

---

[1] The parties disagree whether Brandon stood up while the boat was moving and whether Brandon was involuntarily ejected from the boat, and both parties have cited evidence on the record supporting their position. This dispute presents a genuine issue of material fact appropriately resolved at trial. L.R. 56.1. The Court will presently construe these facts in Plaintiffs' favor for purpose of the present order. *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007).

10

in a vehicle, the vehicle is erratically driven in an objectively unreasonable manner, and he suffers injury as a result.  *See Sisney v. Reisch*, 674 F.3d 839, 845 (8th Cir. 2012) (precedent is clearly established where it delineates the "contours of a right").  Nothing in *Chambers* indicates that the Eighth Circuit's analysis was limited to a particular terrain or form of vehicle.  Rather, in both *Chambers* and Brandon's case, the core question is identical: whether the officer's dangerous driving, which caused the plaintiff physical injury, rose to the level of a constitutional violation.  This is a question the Eighth Circuit has asked in other cases, as well.  *Brown*, 353 F.3d at 1040; *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 904 (8th Cir. 1999); *Brown v. Morgan*, 39 F.3d 1184 (8th Cir. 1994).

Second, although Piercy notes that *Chambers* contained allegations of gratuitous, intentionally-applied force, these allegations merely constituted the factual circumstances that made the *Chambers* officer's actions objectively unreasonable.[2]  In this case, Piercy's actions were objectively unreasonable because of the manner in which Brandon was restrained and placed in the patrol boat: as discussed above, it is uncontroverted that Brandon was handcuffed behind his back, improperly fitted with a Type III life vest, and placed against a flipped-up seat in the boat.  The Eighth Circuit has clearly established

---

[2]       To the extent Piercy is arguing that *Chambers* requires a finding of intentionally-applied force under the Fourth Amendment, this argument is misplaced.  While a seizure "is a governmental termination of freedom of movement *through means intentionally applied*," *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original), the parties do not dispute whether Piercy seized Brandon.  Rather they dispute whether that seizure was reasonable.  Under this inquiry, the Eighth Circuit will consider the reasonableness of the officer's intentional acts, even if those acts were not done with the purpose of causing the ultimate injury.  *See McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003) (asking whether an officer's decision to draw his gun was reasonable, not whether it was reasonable when he then fired it accidentally, causing the injury).  In Brandon's case, therefore, the Court must consider the reasonableness of Piercy's decisions when restraining and transporting Brandon, not the reasonableness of Brandon's exit from the boat.

Case 2:14-cv-04316-NKL   Document 292   Filed 06/29/16   Page 11 of 26

that the manner in which an individual is restrained may give rise to a Fourth Amendment violation. *Kukla*, 310 F.3d at 1050; *Littrell*, 388 F.3d at 586. Accordingly, considering the precedent relevant to this case, it is clearly-established that Brandon may be deprived of his constitutional rights by the manner in which he was restrained, taken in conjunction with the manner in which Piercy transported him thereafter.

Along these lines, while Piercy tries to parse out the events in this suit—arguing that each precedential case must individually provide guidance on unreasonable handcuffing, transit, *and* water rescue—the "objective reasonableness" standard looks at the totality of an officer's actions. *Graham*, 490 U.S. at 396. If an unreasonable restraint can give rise to a constitutional violation, *see Kukla*, 310 F.3d at 1050, and an unreasonable transport can similarly violate a detainee's rights, *see Chambers*, 641 F.3d at 908, then Piercy's unreasonable restraint in light of his driving—and unreasonable driving in light of his restraint—can also amount to a constitutional deprivation.[3] These components of the analysis simply cannot be parsed out.

### 2. Fourteenth Amendment

Piercy argues that because Plaintiffs' constitutional claim can be resolved under the Fourth Amendment, they cannot also maintain a Fourteenth Amendment claim. The United States Supreme Court has remarked that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and

---

[3]  While Piercy also focuses on the events that transpired after Brandon fell off the boat, Plaintiffs do not allege, under Count I of their complaint, that Piercy's failed water rescue constituted a Fourth or Fourteenth Amendment violation. *See* [Doc. 45, pp. 17-18].

its "reasonableness" standard, rather than under a "substantive due process" approach." *Graham*, 490 U.S. at 395. However, in a footnote, the Supreme Court proceeded to observe that "[o]ur cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today." *Id.* at n.10.

By this language, *Graham* recognized a "legal twilight zone" that covers allegations of excessive force between arrest and sentencing. *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000). Addressing claims falling within this zone, the Eighth Circuit has found "that it is appropriate to use a Fourth Amendment framework to analyze excessive force claims arising out of incidents occurring shortly after arrest." *Chambers*, 641 F.3d at 908. Therefore, the Eighth Circuit has "applied Fourth Amendment excessive force standards to incidents occurring during the transportation, booking, and initial detention of recently arrested persons." *Id. See also Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011) ("It is settled in this circuit that the Fourth Amendment's 'objective reasonableness' standard for arrestees governs excessive-force claims arising during the booking process.").

Brandon's case falls partially within this twilight zone because, as discussed above, Plaintiffs have presented a submissible claim that Piercy applied unreasonable force in his interactions with Brandon. That claim is properly assessed under the Fourth Amendment.

13

Yet the Eighth Circuit has not extended the Fourth Amendment to *all* claims arising out of the post-arrest period. *See, e.g., Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998) (an allegation of sexual assault following an arrest, which is not considered an excessive force claim, is analyzed under the Fourteenth Amendment); *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016) (declining to decide whether an officer's denial of medical care following an arrest is analyzed under the Fourth or Fourteenth Amendment). Unlike in *Graham* and the case cited by Piercy, *Riley v. Hessenflow*, 2013 WL 139650 (W.D. Mo. Jan. 10, 2013), Plaintiffs also argue that Piercy owed Brandon a custodial duty of care under the Due Process Clause of the Fourteenth Amendment. Under this inquiry, officers such as Piercy have a "duty to assume some responsibility for [a person's] safety and general well-being" when that person is taken into custody and held against his will. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). The Eighth Circuit has applied this standard to cases with fact patterns analogous to Brandon's. *See Spencer*, 183 F.3d at 904 (applying the Fourteenth Amendment where the plaintiff was injured while being transported to booking; he had been placed in a police vehicle without a seatbelt and then subjected to erratic driving).[4]

Therefore, it is an open question whether all claims that contain some Fourth Amendment component and arise during transport must fall, in their entirety, within *Chambers*' twilight zone—even if the plaintiff alleges violations in addition to excessive

---

[4] While *Spencer* was decided before *Chambers*, the Eighth Circuit has recently suggested that *Spencer*'s application of the Fourteenth Amendment may still be applicable in these situations. *See Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016).

force.  Considering the approach taken in *Spencer* and the unsettled state of the law in this area, the Court cannot say, as Piercy argues, that Plaintiffs' claims "are not also cognizable as violations of substantive due process."  [Doc. 229, p. 20].  Plaintiffs are not proscribed from pursuing their Section 1983 claim under both the Fourth and Fourteenth Amendments at this time.

Alternatively, Piercy asserts he is entitled qualified immunity on any Fourteenth Amendment claim stemming from Brandon's arrest.  The Court rejected this argument in its prior order, where it wrote:

> Considering the perspective of a reasonable officer on the scene, the Court again cannot say that the sum of Piercy's actions were objectively reasonable.  When taking Brandon into his custody, Piercy handcuffed Brandon behind his back, thereby significantly limiting Brandon's capacity to protect himself during a water transport.  Nevertheless, Piercy secured Brandon with a flotation device that would not keep him afloat, positioned Brandon against a flipped-up seat that would not keep him restrained, and drove across the lake at a speed that could dislodge a person, such as Brandon, who was unable to hold onto the vehicle.  These are not reasonable choices.  Rather, Piercy's alleged actions created, and then ignored, an obvious danger to the person held within his custody.  Regardless of whether Plaintiffs can ultimately succeed on their claim, they have sufficiently alleged a due process violation.

> Piercy argues he is nevertheless shielded by qualified immunity.  Yet having examined the precedent behind Plaintiffs' Fourteenth Amendment allegations, the Court finds it "beyond debate" that "[w]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some

15

responsibility for his safety and general well-being." *Cty. of Sacramento*, 523 U.S. at 851 (*quoting Whitley v. Albers*, 475 U.S. 312, 327 (1986)). *See also Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) ("[T]he state owes a duty to protect those in its custody."). Further, the Eighth Circuit has found that a detainee's Fourteenth Amendment rights can be violated by the manner in which he is transported. *Spencer*, 183 F.3d at 904. *See also Brown v. Missouri Dep't of Corr.*, 353 F.3d 1038 (8th Cir. 2004); *Brown v. Morgan*, 39 F.3d 1184 (8th Cir. 1994). A long line of Eighth Circuit cases has also established that a due process violation can occur where an official's action puts someone "at a significant risk of serious, immediate, and proximate harm." *Estate of Johnson v. Weber*, 785 F.3d 267, 272 (8th Cir. 2015) (*quoting Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011)).

[Doc. 241, pp. 18-19].

The Court reached this conclusion by applying both the objective reasonableness standard, *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015), and the deliberate indifference standard, which asks whether the officer knew about and disregarded an excessive risk to the individual's safety, *see Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). Again, the Court's analysis remains the same at the summary judgment stage. As discussed above, Piercy admits that he handcuffed Brandon behind his back, placed an unsecured Type III vest on Brandon's body, and positioned Brandon against a flipped-up seat in the patrol boat.

It is further uncontroverted that Piercy proceeded to drive across the lake at speeds that reached, at least at one point, forty miles per hour. Because Piercy also admits that he suspected Brandon of intoxication, Plaintiffs have established a submissible

16

Fourteenth Amendment case under the deliberate indifference standard: a jury could find that Piercy knew of an existing risk—that an inebriated person, when handcuffed behind his back without a secured flotation device and positioned leaning against a flipped-up, may fall into the water—but he disregarded that risk by driving at excessive speeds. *See Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) ("This court has previously held that failure to provide a seatbelt to a prisoner while driving in a manner that puts the prisoner at risk of injury can constitute deliberate indifference to a prisoner's safety and health.").

Piercy's motion for summary judgment on Count I is denied.

**B. Count II; Civil Rights Violations against Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour**

Several of the remaining defendants in this suit— Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour—move for summary judgment on Count II, arguing that the record does not support a finding of liability for their roles in Brandon's constitutional deprivation. While none of these Supervisor Defendants directly participated in Brandon's arrest or transport, a supervisor may still be held liable under Section 1983 "if his failure to train or supervise the offending actor caused the deprivation." *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806-07 (8th Cir. 1994) (*citing City of Canton*, 489 U.S. 378, 388 (1989)).

In their complaint, Plaintiffs argue that:

These Defendants, deliberately and with reckless disregard for the constitutional rights of the people or persons within the custody of the Missouri State Highway Patrol, failed to establish adequate and sufficient policies and procedures for training supervisors and officers within the

17

Missouri State Highway Patrol to safely effectuate the arrest of individuals alleged to be operating a boat while intoxicated, including but not limited to: how an individual is to be handcuffed; the type of personal floatation device to be used; the manner in which the personal floatation device is to be secured on the individual; how the individual is to be positioned during transport by patrol boat; and the operation of the patrol boat by the officer responsible for transporting the individual while on the water in a manner exercising the highest degree of care.

[Doc. 45, p. 20].

The Defendants assert in response that (1) their policies were constitutional and (2) they lacked any notice suggesting Piercy was being inadequately trained or supervised. Even assuming, for purposes of this order, that all these Defendants had the authority to implement policies and all served as Piercy's supervisor, uncontroverted material evidence on the record demonstrates that none of the policies or training at issue were so deficient as to rise to the level of a constitutional violation.

### 1. Policies

The parties dispute whether the Supervisor Defendants can be held liable for sanctioning two MSHP policies, Special Order No. 8 and General Order 48-3. The first provides that a "Coast Guard approved personal flotation device will be placed on any prisoner transported in patrol watercraft." [Doc. 231-6, p. 1]. The second directs that suspects "should be search for weapons, handcuffed, secured in a U.S. Coast Guard approved Type I or Type II personal flotation device, and placed in a Patrol vessel" when being arrested for intoxicated boating. [Doc. 231-8, p. 1].

18

Taken together, the Supervisor Defendants argue, these two policies instruct officers that an approved life vest must be used on prisoners, and that a Type I or Type II device should be used in the specific case of a BWI arrest. The Supervisor Defendants emphasize the Piercy did not follow these policies when he placed a Type III life vest on Brandon. Therefore, these Defendants maintain, the policies did not cause Brandon's death, but rather Piercy's decision to disregard them.

Plaintiffs admit that the two policies can be read together. Nevertheless, they argue the policies contain "vagaries," which "render [them] inherently inadequate to protect prisoners being transported by boat." [Doc. 270, p. 58]. Plaintiffs appear to argue that these "vagaries" arise from the discretion granted officers under Special Order No. 8 and General Order 48-3: they note that an officer has discretion between using a Type I or Type II vest, and that considering the inherent risk of drowning during a water arrest, officers should be trained for the circumstances where a Type III device may be required. As such, Plaintiffs maintain that "the policies fail[] to sufficiently provide for the safety of prisoners." [Doc. 270, p. 9].

The Eighth Circuit has held that "there must be an affirmative link between the policy and the particular constitutional violation alleged." *Edwards v. Baer*, 863 F.2d 606, 609 (8th Cir. 1988). Where an officer fails to follow a policy, and an individual is injured as a result, "[i]t is therefore difficult to comprehend any way in which the [] policy or custom brought about the constitutional violation that occurred." *Id*. The same reasoning applies to Brandon's case. While Plaintiffs challenge the discretion granted Piercy under the policies, which permitted him to use a Type I or Type II device, this

19

discretion is not relevant because Piercy ultimately did not use either vest. Instead, he acted outside of the guidelines established by the two orders in securing Brandon with a Type III vest, which the parties agree later separated from Brandon's body before he drowned. Therefore it was Piercy's decision to deviate from the policies—not the policies themselves—that contributed to Brandon's death.[5]

Nevertheless, citing *Seymour v. City of Des Moines*, 519 F.3d 790 (8th Cir. 2008), Plaintiffs argue that liability can be imposed where officials are deliberately indifferent to the "known or obvious consequences" of a facially lawful policy. [Doc. 270, p. 57] (*quoting Seymour*, 519 F.3d at 800). In *Seymour*, the Eighth Circuit rejected the plaintiffs' argument that a municipal policy was taken with deliberate indifference because, applying the standard of a failure-to-train claim, the court found no evidence that the defendant had failed to adequately train its officers.

In Brandon's case, the "obvious consequence" identified by Plaintiffs is the risk of drowning during water transport, which Plaintiffs maintain should have prompted additional training in conjunction with the MSHP's policies, including training on Type III life vests, prisoner placement, and patrol boat speed. Yet as in *Seymour*, this argument is best addressed under Plaintiffs' allegations that the Supervisor Defendants failed to adequately train Piercy.

## 2. Supervision and Training

---

[5]     Plaintiffs deny the Defendants' contention that "[h]ad Piercy used the [flotation device] appropriately, it is highly unlikely that Brandon would have died." [Doc. 231, p. 3]. Regardless of the degree of likelihood, however, Plaintiffs would have no causal grounds to challenge the MSHP's life vest policies if Piercy's selection of a life vest did not contribute, at least in part, to Brandon's death. *Edwards*, 863 F.2d at 609.

On a claim for failure to supervise, a "supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340-41 (8th Cir. 2015). The Supervisor Defendants argue that Plaintiffs have not established either of these prongs. They therefore ask the Court to grant summary judgment on Plaintiffs' training allegations.

Turing to the first prong, a supervisor receives notice of unconstitutional acts where he knows about a subordinate's "other misconduct [that is] very similar to the conduct giving rise to liability." *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012). Plaintiffs have offered no evidence suggesting past misconduct by Piercy. No evidence on the record demonstrates that Piercy previously had trouble properly applying life vests or transporting prisoners.[6] In response to the Supervisor Defendants, who offer affidavits stating that no supervisor was aware of any past misconduct committed by Piercy, Plaintiffs contend only that Piercy received inadequate training and that his supervisors demonstrated reckless disregard towards that deficiency when deciding whether he was prepared for water duty.[7] Yet this argument challenges the MSHP's training program in general—not any specific failure to supervise Piercy himself.[8]

---

[6]    Plaintiffs argue that Piercy was known as a poor swimmer. However, their cited evidence demonstrates that Piercy was rated a "poor" swimmer when he began his training and a "fair" swimmer when he completed it. [Doc. 275-41]. To the extent deficient swimming can constitute prior misconduct, permitting a fair swimmer to patrol the water, while perhaps negligent, does not rise to the level of a constitutional deprivation.

[7]    Plaintiffs cite at length to *Tilson v. Forrest City Police Dep't*, 28 F.3d 802 (8th Cir. 1994). However, Plaintiffs have relied on *Tilson*'s dissenting opinion. *See id.* at 809 (Lay, J., dissenting). The

Accordingly, to show that the training program itself was constitutionally deficient, Plaintiffs must demonstrate that (1) the MSHP's "training practices were inadequate," (2) the "failure to train reflects a deliberate and conscious choice," and (3) the "deficiency in the [MSHP's] training procedures actually caused" the injury. *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007). Supervisors are entitled qualified immunity "unless a reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue." *Parrish v. Ball*, 594 F.3d 993, 1002-03 (8th Cir. 2010).

The Eighth Circuit sets a high bar for an "inadequate" training program to constitute a civil rights deprivation. A program is constitutionally inadequate where the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisors] . . . can reasonably be said to have been deliberately indifferent to the need." *Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997). The Eighth Circuit's decision in *Williams-El v. Johnson*, 872 F.2d 224 (8th Cir. 1989) is illustrative. In *Williams-El*, a corrections officer was made solely responsible for a GED class of twenty prisoners and a ward of mentally retarded inmates. Contrary to the jail's policies, the officer did not have a high school degree and had not

<hr>

majority in *Tilson* held that the facts presented were insufficient to impose liability on the supervisor. *Id.* at 808.

[8] Accordingly, the parties' disagreement about Sergeant Henry's authorization for Piercy to operate a boat on the lake is immaterial. Henry recommended that "Piercy be allowed to operate a State owned boat by himself." [Doc. 231-14, p. 1]. Defendants maintain they reasonably relied on this clearance; Plaintiffs argue that Henry's statement did not authorize Piercy to conduct water arrests or rescues. Because it is uncontroverted that Piercy completed the training program and demonstrated no past misconduct, the dispositive question is whether the training program, itself, was constitutionally-deficient, not whether Piercy in particular was properly authorized to patrol the water.

undergone a required two-week training course. Yet the *Williams-El* court found that "the officer was not without training and guidance" because "he had received on-the-job training," was expected to eventually receive academy training, and "had received some instruction on the correct use of force through . . . the training manual." *Id*. at 227. Consequently, the Eighth Circuit affirmed a directed verdict on the plaintiff's failure-to-train claim alleged against the officer's direct supervisor.

Since *Williams-El*, "several [other] cases in [the Eighth Circuit] have held that attendance at a training academy and on-the-job training is sufficient for proper training." *Tucker v. Evans*, 276 F.3d 999, 1003 (8th Cir. 2002) (finding adequate training where the officer completed a six-week course and received on-the-job training). *See also Andrews v. Fowler*, 98 F.3d 1069, 1076-77 (8th Cir. 1996) (finding adequate training where officers received two weeks of on-the-job training and were sent to the police academy). Piercy's situation is analogous. It is uncontroverted that Piercy participated in Marine Enforcement Training in 2012 and 2013. As part of this training, Piercy completed a three-day familiarization program, took a class on boat operations, attended a four-week course on marine enforcement, and then began working shifts alongside veteran marine officers. Just as in *Tucker* and *Andrews*, therefore, Piercy received both academy and on-the-job training.

Plaintiffs maintain that even if Piercy attended this training, it nevertheless was not adequate. But again, there is uncontroverted evidence on the record that Piercy received at least some training on how to place prisoners in patrol boats, [Doc. 275-18, p. 5], secure prisoners, and transport them on the water, [Doc. 275-32, p. 15]. Plaintiffs

23

admit that Piercy observed officers arrest and transport prisoners by boat on at least two occasions, [Doc. 270, p. 33], and their evidence further supports this conclusion, *see* [Doc. 274-4, pp. 35-36]. Plaintiffs elsewhere state that "since [Piercy] was trained in March and April, he had no specific training on transporting prisoners," [Doc. 268, p. 22], but the Court understands this assertion to mean only that Piercy did not observe any arrests or prisoner transports in March or April of 2014. *See* [Doc. 275-23, p. 3].

Plaintiffs further admit that "[f]lotation device procedures, including where to secure the flotation device on a handcuffed individual, are also covered at the Academy training," [Doc. 234, p. 9], although they claim that "there are material fact issues as to whether the training Piercy received was inadequate through these programs," [Doc. 272, pp. 10-11]. Plaintiffs appear to rely on Piercy's deposition testimony, where he stated that flotation device training consisted of "laying [the devices] on a table" and that he "d[idn't] know" whether such training was adequate. [Doc. 275-32, p. 15]. Therefore, the record shows that Piercy received at least minimal training in this area. *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) ("Even though the training [the officer] received was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train.").

To the extent Piercy was not fully-trained on the difference between various types of flotation devices, the Court finds "no patently obvious need" to train officers that a suspect must be secured, in *some* manner, in a life vest, whether by placing his arms through the vest's holes or by applying a crotch strap. *Livers v. Schenck*, 700 F.3d 340, 356 (8th Cir. 2012) (finding "no patently obvious need" to train employees not to

24

fabricate evidence). This is a matter of common sense. As in *Livers*, "[a]ny reasonable [MSHP] employee would know [Piercy's actions were] unacceptable."[9] *Id*.

The Court recognizes that Plaintiffs have offered numerous additional facts, some of which are uncontested, regarding deficiencies in the training Piercy received. Yet while these facts may indicate negligence on the part of defendants to this suit, they simply do not rise to the level of a constitutional violation.

Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour are granted summary judgment on Count II.

### C. Count VI; Negligent Hiring, Training, and Supervision Against Defendants Barbour, Echternacht, and McCullough

Defendants Barbour, Echternacht, and McCullough move for summary judgment on Count VI, arguing they are entitled sovereign immunity for Plaintiffs' negligent hiring claim alleged against them in their official capacities. Plaintiffs have not contested this argument and have not shown any ground for waiving sovereign immunity in this case.

Therefore, Defendants Barbour, Echternacht, and McCullough are granted summary judgment on Count VI.

---

[9] The parties dispute whether Piercy was trained in conducting water rescues. Plaintiffs maintain there is no evidence on the record that Piercy was trained on the topic. Defendants Replogle, Johnson, Kindle, Clardy, Stacks, the MSHP, and State of Missouri disagree, pointing to Doc. 284-2, which shows that Piercy took courses in "survival swimming" and "tactical water survival." [Doc. 284-2, p. 2]. An issue of fact remains whether these courses covered water rescues, but it is not material to this order. Plaintiffs, in Count II of their complaint, do not allege that the Supervisor Defendants provided constitutionally-deficient water rescue training. Rather, as quoted above, they claim these Defendants provided inadequate training only with respect to "how an individual is to be handcuffed; the type of personal floatation device to be used; the manner in which the personal floatation device is to be secured on the individual; how the individual is to be positioned during transport by patrol boat; and the operation of the patrol boat by the officer responsible for transporting the individual while on the water in a manner exercising the highest degree of care." [Doc. 45, p. 20].

**D. Count VII; Negligent Hiring, Training, and Supervision Against Defendants Eberhard and Herndon**

Defendants Eberhard and Herndon ask the Court to grant them summary judgment on Count VII, arguing they are also entitled sovereign immunity for Plaintiffs' negligent hiring claim alleged against them in their official capacities. Plaintiffs have not contested this argument and have not shown any ground for waiving sovereign immunity in this case.

Therefore, Defendants Eberhard and Herndon are granted summary judgment on Count VII.

**III.    Conclusion**

For the foregoing reasons, the Court orders as follows:

- Defendants Replogle, Johnson, Kindle, Clardy, McCullough, Echternacht, and Barbour are granted summary judgment on Count II.
- Defendants Barbour, Echternacht, and McCullough are granted summary judgment on Count VI.
- Defendants Eberhard and Herndon are granted summary judgment on Count VII.
- Defendant Piercy's motion for summary judgment on Count I is denied.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  June 29, 2016
Jefferson City, Missouri